## In re TEXAS CITY DISASTER LITIGATION.

### No. 13314.

United States Court of Appeals
Fifth Circuit.

June 10, 1952.

Hutcheson, Chief Judge, and Borah, Circuit Judge, dissented in part.

Eberhard P. Deutsch, Sp. Asst. to Atty. Gen. of United States, New Orleans, La., and Massillon M. Heuser, Atty., Department of Justice, Washington, D. C., for the United States. With them on the brief were Atty. Gen. J. Howard McGrath, Deputy Atty. Gen. Peyton Ford, Asst. Attys. Gen. Holmes Baldridge and H. Graham Morison, and U. S. Atty. Brian S. Odem Houston, Tex., Sp. Asst. to Atty. Gen. George O'Brien John, Houston, Tex., Paul A. Sweeney, Morton Liftin, Sidney J. Machtinger, and Robert P. Breazeale, Attorneys, Department of Justice, Washington, D. C., and Brigadier General Claude B. Mickelwait, San Francisco, Cal., Lieutenant Colonel Burton K. Philips, St. Louis, Mo., and Captain Ralph L. Kaskell, Jr., Judge Advocate General's Corps, Jamaica, N. Y., United States Army.

Austin Y. Bryan, Jr., of Houston, Tex. argued the cause for the appellees. With him on the brief were Thomas Fletcher, John R. Brown, M. S. McCorquodale, Houston, Tex., Neth L. Leachman, Dallas, Tex., T. E. Mosheim and Vernon Elledge, Houston, Tex.

Before HUTCHESON, Chief Judge, HOLMES, BORAH, RUSSELL, STRUM, and RIVES, Circuit Judges, En Banc.

RIVES, Circuit Judge.

This litigation arises under the Federal Tort Claims Act.[1]

For an understanding of the questions presented, we quote the statement of the case as made by the learned district judge:

"These are approximately 273 suits (including the above suit No. C. A. 787, Dalehite, et al. v. United States of America) by approximately 8485 persons or Plaintiffs against Defendant, United States of America, under the Federal Tort Claims Act, Section 2671 et seq., Title 28, Judicial Code effective September 1, 1948, formerly Section 941, Title 28 U.S.C.A., Act of August 2, 1946, and Amendments, and arising out of what is generally known and referred to, and is referred to herein, as the Texas City Disaster, in which much of the City or Town of Texas City, in Galveston County, Texas, was destroyed, with great loss of life, injuries to persons, and heavy property damage. The claim is that on April 16, and 17, 1947, fires and violent explosions occurred on the Steamships Grandcamp and High Flyer then being loaded with a cargo for foreign ports in the Texas City Harbor. It is claimed that such fires and explosions, and/or other fires and other explosions, etc., which followed and which were proximately caused thereby, killed or caused the death of approximately 560 persons—men, women and children —and wounded many other persons in and around Texas City and in the Texas City Harbor, and did vast and widespread damage and injury to property in that area. Of the 8485 Plaintiffs, approximately 1510 sue on death

claims, approximately 988 on personal injury claims, approximately 5987 on property damage or destruction claims.

"It is claimed and alleged that such fires and explosions were caused on the Grandcamp and the High Flyer by a cargo or part cargo of ammonium nitrate, or fertilizer ammonium nitrate, or FGAN (for brevity called herein Fertilizer), thereon becoming ignited and burning and/or exploding. It is alleged that such Fertilizer was a known dangerous explosive and a fire hazard and was manufactured by Defendant and shipped and transported by Defendant or directed or permitted by Defendant to be shipped or transported into Texas City without warning to the public or to any City, State, or other Officer of Texas City, and loaded on such Steamships. And that the Defendant and its agents and employees were guilty of negligence in so doing and also guilty of negligence in manufacturing such Fertilizer at all and in the manner of the manufacture, sacking, bagging, marking of bags, handling, shipping, transporting, loading, etc. of such Fertilizer.

"After these suits were filed, the parties, including those in the above case No. C. A. 787, Dalehite, et al. v. United States of America, moving under Rule of Civil Procedure 42, 28 U. S.C., with the approval of the Court, entered into an Agreement or Stipulation for such suits to be consolidated for hearing and heard or tried on the question or issue common to all parties, of the negligence of Defendant or of the liability, if any, of Defendant to Plaintiffs under such Tort Claim Act. Reference is made to the Order of Consolidation, etc., dated July 21, 1948, and other subsequent Orders of Consolidation.

[1]. 60 Stat. 842, reenacted in the codification of Title 28 (Judicial Code), 62 Stat. 869, 992. The rights of parties under the original enactment are preserved. See United States v. Yellow Cab Co., 340 U.S. 543, 547, footnote 4, 71 S.Ct. 399, 95 L. Ed. 523. For convenience we shall refer to the sections of Title 28 of the Code, though we call attention to an apparent inconsistency between the scope of Sections 2674 and 1346(b) which inconsistency does not appear in the terms of the original Act.

"It appearing that the Plaintiffs in the 273 or more consolidated suits were represented by perhaps 50 or 100 different counsel, with approval of the Court, counsel for Plaintiffs in such suits agreed upon a Working Committee of Attorneys, whose names appear on the first page hereof, to prosecute such consolidated suit, and they have appeared and so prosecuted same.

"It was also agreed between the parties, in order that a complete case should be presented to the Court, that one of the consolidated cases, i. e., Cause No. 787, Elizabeth Dalehite and Henry G. Dalchite, Jr. v. United States of America, should be fully tried. This is a suit by the surviving wife and son of Captain Henry G. Dalehite, who it was alleged was killed in such Disaster.

"Each of the Plaintiffs in the suits filed and which were consolidated, as stated, alleges many and numerous acts of negligence upon the part of Defendant, all of which, to the number of 80 or more were carried into Plaintiffs' Consolidated Pleadings in this Consolidated Cause, filed March 16, 1949. It does not seem appropriate to set them forth in detail here, but reference is made to such pleadings for particulars and details. Generally speaking, it is charged and alleged that the Fertilizer which burned and/or exploded in such Steamships was a known very dangerous explosive and fire hazard which was manufactured by Defendant and/or under its direction. That such Fertilizer being a very dangerous commodity, Defendant was negligent in manufacturing it at all, and negligent in the manner in which it manufactured, handled, transported, shipped, etc., same. Particularly it is claimed that Defendant was greatly at fault and negligent in, without warning to anyone of the danger, shipping such Fertilizer or permitting it to be shipped into and handled in the densely populated city or town of Texas City, etc., where as stated such fires and explosions occurred.

"In a Trial Amendment, filed with leave of the Court, July 20, 1949, Plaintiffs more specifically allege and set out the names of the persons, agents, servants, or employees of the Defendant claimed to be guilty of negligence.

"Defendant in its Answer, filed April 4, 1949, brought forward some fifteen defenses.

"Its First Defense that Plaintiffs should be required to make a more definite statement of their case was denied.

"Its Second Defense that Plaintiffs fail to state a claim upon which relief may be had was denied.

"Its Third, Fourth, and Fifth Defenses that Plaintiffs in effect fail to state a case cognizable in this District were denied.

"Its Eighth and Ninth Defenses questioning the authority of the Working Committee were denied.

"Its Sixth and Tenth Defenses with respect to assigned claims, its Seventh Defense raising the question of Limitation, and its Fifteenth Defense pleading contributory negligence, etc. are not within the scope of the Consolidation Agreement and are, therefore, not disposed of at this time.

"By its Eleventh, Twelfth, Thirteenth and Fourteenth Defenses Defendant denies, and there is put in issue, each and all of Plaintiffs' allegations, and same are herein disposed of under such Consolidation Agreement.

"This is a trial on the merits under such Consolidation Agreement, lasting approximately 90 days, and on briefs and oral argument of counsel, and a trial on the merits of cause No. C. A. 787, Elizabeth Dalchite and Henry G. Dalehite, Jr. v. United States of America, on all issues.

"The Record is enormous. The Transcript consists of nearly 20,000 pages, and there are hundreds of exhibits. This would of itself tend to show that all the sources of evidence bearing on the questions and issues now before the Court have been thoroughly explored

and all the evidence produced that can be found and produced, except as hereinafter stated. In addition, counsel on both sides, at the close of the trial, assured the Court that they had no other evidence to present on the matters now before the Court, except as hereinafter stated. The exception is that Plaintiffs are still complaining of the failure of the Court to again enforce the production of some additional records, etc. of and/or in the possession of, the United States Federal Bureau of Investigation, which records such Bureau refused to produce, as is fully shown by the Transcript.

"Counsel for Plaintiffs and Defendant have, at the Court's request, indicated what Findings of Fact they think should be made, but many of such requests for Findings are for Findings on *evidence* as distinguished from Findings on the *issues* as made by the pleadings. Such requests are hereinafter disposed of. An effort has been made to find the facts only on the *issues,* and thus bring the case within as small compass as possible."

On May 4, 1950, the court entered judgment in the composite case, with a decree as to amount with interest from the date of judgment in the one actual case, and a "final" decree as to liability, subject to certain reserved defenses and future determination of quantum, with interest from May 4, 1950, in all other suits.

The United States entered appeals in all cases. By order of this court, the appeal was heard on the record in the composite case alone.

The claimed errors of which the United States complains are succinctly set forth in its "Specification of Errors" as follows:

"Specification of Errors

"The district court erred:

"1. In failing to hold that the pleadings and proof furnished neither basis of jurisdiction in the district court nor liability against the United States under the Federal Tort Claims Act, for the reason that the claims asserted

"a. fell within specific exceptions under the statute, for claims based upon

"(1) 'the. exercise or performance, or the failure to exercise or perform, a discretionary function or duty'; or

"(2) 'an act or omission of an employee of the government, exercising due care, in the execution of a statute or regulation'; and

"b. did not fall within the affirmative statutory requirements that claims be based upon

"(1) *respondeat superior* arising from an identifiable employee's negligent act or omission; and

"(2) an act or omission for which 'a private individual under like circumstances' would be liable.

"2. . In finding that, by the manufacture and distribution of FGAN, the United States 'was creating and maintaining a nuisance'.

"3. In holding preliminary motions filed in behalf of the United States, for a deposition, discovery, interrogatories, more definite pleading, and for procedural rulings, in abeyance until it knew 'more about the case'; and in its rulings thereon; in failing to rule on hundreds of objections to evidence noted by counsel for the United States, and in 'taking them with the case'; and in denying the motion of the United States, at the close of plaintiffs' case, to rule on the objections, and to strike the inadmissible evidence, and in its ultimate rulings thereon.

"4. In holding the United States negligent in any way in the initiation of the ammonium nitrate fertilizer program, in the production. and distribution of the fertilizer, or in connection with the activities of the Coast Guard.

"5. In holding that the '80 or more' charges of negligence against the United States as such were 'all supported and sustained by the evidence', and that each of these '80 or more' acts and omissions 'constituted a proximate cause' of the disaster.

"6. In holding that the United States was the shipper of the fertilizer

on the Steamships Grandcamp and High Flyer, and the owner thereof at least up to the time of its loading, and 'that control of and over such fertilizer never passed out of' the United States.

"7. In denying the motion for judgment in behalf of the United States at the close of plaintiffs' case, in refusing to make the findings proposed on behalf of the United States, and, while expressly reserving various defenses of the United States, in entering 'final judgment' against the United States in the more than 300 cases pending, for 'damages as later ascertained by the court, with interest on such figures so subsequently determined, from the date hereof.' "

The claimed errors may be broadly divided into three classes: (1) errors of substantive law in the interpretation of the scope of the Federal Tort Claims Act, (2) procedural errors, and (3) erroneous findings of fact on negligence.

If the plaintiffs have any right to recover damages from the United States, the case must come under the terms of the Federal Tort Claims Act, approved August 2, 1946, and, to be specific, must meet each of the following requirements of that Act:

1. The only jurisdiction conferred on the district court is of actions on claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S. C.A. § 1346(b).

2. "Under circumstances where the United States, if a private person, would be liable to the claimant." Sec. 1346 (b).

3. "In accordance with the law of the place where the act or omission occurred." Sec. 1346(b).

4. The jurisdiction conferred does not apply to "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." Sec. 2680(a).

5. Nor does it apply to "any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Sec. 2680 (a).

■ The purpose of the Act was not "the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence. * * * Its effect is to waive immunity from recognized causes of action and was not to visit the Government with novel and unprecedented liabilities." Feres v. U. S., 340 U.S. 135, 141, 142, 71 S. Ct. 153, 157, 95 L.Ed. 152.

"This Act does not subject the Government to a previously unrecognized type of obligation. Through hundreds of private relief acts, each Congress for many years has recognized the Government's obligation to pay claims on account of damage to or loss of property or on account of personal injury or death caused by negligent or wrongful acts of employees of the Government. This Act merely substitutes the District Courts for Congress as the agency to determine the validity and amount of the claims. It suggests no reason for reading into it fine distinctions between various types of such claims." U. S. v. Yellow Cab Co., 340 U.S. 543, 548, 71 S.Ct. 399, 404, 95 L.Ed. 523.

Repeatedly, throughout the Act, the term used is "act or omission of an employee of the Government". For any cause of action to exist, the "negligent or wrongful act or omission" must be that of an "employee of the Government". "Employee of the Government" is defined, at least in part, in Section 2671.

A judgment or compromise under the statute effects complete release of a claim, and a bar to an action "against the employee of the Government whose act or omission gave rise to the claim". Secs. 2672, 2676.

Section 424(b) of the original Act provided that nothing contained in the stat-

776

ute is to be deemed as repealing authority, under other provisions of law, to settle claims for damages "not caused by any negligent or wrongful act or omission of an employee of the Government."

Excluded from the jurisdiction of the Court are "any claim[s] based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation" and "any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government". For the Government to be held liable for the breach of any duty as an entity in the manufacture or shipment of FGAN, these two exclusions would have to be disregarded. The event around which the entire statute is built is an "act or omission of an employee of the Government", and for the statute to be construed as a harmonious whole it must be so limited. See Sickman v. United States, 7 Cir., 184 F.2d 616, 619; United States v. Campbell, 5 Cir., 172 F.2d 500, 503. This court has recognized that liability because of the ownership of property is not included in the Act. Hubsch v. U. S., 5 Cir., 174 F.2d 7, 10.

The necessity of some definite act of commission or omission on the part of some particular employee or employees of the Government as a predicate for its liability is emphasized by the requirement of Section 1346(b) that liability be determined "in accordance with the law of the place where the act or omission occurred." So construed, the Act merely subjects the Government to the same liability as the delinquent employee in accordance with the local law.

We have found no place in the legislative hearings where the liability of the United States as a manufacturer or shipper was discussed. Typical of the kind of immunity intended to be waived is that for injury or damage resulting from the negligent operation of motor vehicles repeatedly referred to in the hearings before the legislative committees (See for example Hearings before the House Judiciary Com-

mittee on H.R. 5375 and H.R. 6463, 77th Congress 2nd Session (1942), 24, 28, 65, 66). The most common claims that were the subjects of hundreds of relief acts were for injury or damage caused by negligent or wrongful acts of employees of the Government. Congress sought relief from the burden of determining the validity and amounts of such claims, and substituted the District Courts for Congress as the agency therefor. See United States v. Yellow Cab Co., 340 U.S. 543, 548, 549, 71 S.Ct. 399, 95 L.Ed. 523. Another reason why it cannot be assumed that Congress intended to place upon the United States the legal liability of a manufacturer as an entity, is that as such the Government would be charged with all of the knowledge or notice of any of its agents or employees, acquired or possessed in the course of their employment. See 1 Am. Law Inst. Restatement of Agency, Sec. 272; 13 Am.Jur. Corporations, Secs. 1110 et seq. The evidence in this case illustrates that the application to the Government of that theory of imputed knowledge would require the Government to be regarded as practically omniscient, and probably, in the many cases where employees differ in their opinions, as being an infallible judge of the right. It would impose on the Government as manufacturer an unreasonably high degree of duty, almost to the point of being an insurer. Upon consideration of the terms of the Act, we conclude that it imposed no duty on the Government as an entity in the manufacture or shipment of FGAN.

Plaintiffs, in their consolidated complaint, failed to charge any specific negligent or wrongful act or omission against any particular employee or agent of the United States, simply resting on their eighty averments of negligence on the part of the United States as such. On July 20, 1949, the day on which they rested in the taking of testimony, the plaintiffs filed an amendment to their consolidated complaint, charging that various departments of government, from the Office of War Mobilization to the Bureau of Standards, some 200 named or designated officials, and others, "the remaining federal agencies, executive departments, [and] independent establish-

ments of the United States" and "the head of [each] such department and all subordinate personnel whether civilian or military" all contributed to "each ground of negligence and fault alleged in plaintiff's consolidated pleadings * * *." Plaintiffs' counsel well summarized in his closing argument to the district court: "It is the whole Government. It is everybody in organization. Everybody from the President to dishwashers in the cafeteria."

The district court in its findings said in part:

"The difficulty is that this large Record shows that in the error and mistake of manufacturing and distributing this dangerous commodity, so many took part that in naming them some will be overlooked or omitted. They may well be grouped as follows:

"Group I—Those who, among other things negligently planned, launched, and carried on the enterprise of manufacturing, shipping, and distributing such Fertilizer. Among this group are the following: * * *

"Group II—Those who among other things negligently manufactured, sacked, shipped, transported, and distributed such Fertilizer. Among this group are the following: * * *

"Group III—The United States Coast Guard, officers and men who may have been among other things charged with some duty with respect to such Fertilizer at the time of and after its arrival at Texas City and at the time of and after its explosion and the fires which followed. And including those charged with the duty of administering and enforcing Title 46 U.S.C. A., dealing with the shipment of dangerous explosives. Some of whom are as follows: * * *

"It is not meant that these groups or the members of these groups were negligent in the same way or to the same degree, but that they in some way and to some extent contributed to such negligence by acts of omission or commission."

The district court named some 160 persons as among these three groups.

Let us consider separately the three groups of employees:

"Group I—Those who, among other things, negligently planned, launched and carried on the enterprise of manufacturing, shipping, and distributing such fertilizer."

The fertilizer program was designed to meet the immediate and pressing problem of increasing the food supply of the devastated areas of the world following the holocaust of World War II. Two basic solutions were available: One, maintenance of adequate military forces of occupation to quell unrest resulting from hunger; Two, the increase of the supply of food to sustain enemy populations during occupation. Humanitarian considerations required that at least subsistence feeding be provided to the people of conquered areas to insure public order and safety. The populations of the devastated areas aggregated nearly that of the United States themselves. If there had been enough food to supply those areas directly there would not have been enough bottoms to transport it. Early in 1947 the President expressed his views "that our relief contribution should be used only for providing the basic essentials of life, such as * * * items which will aid in the production of foodstuffs." Message of President Truman to 80th Congress (1st Session), 93 Cong. Record 1301.

While fertilizer production in the United States was the greatest in the world, the minimum requirement for the devastated areas was more than half the United States production. There was discussion of the production of ammonium sulphate which would have been desirable but the facilities for such production were not available. Ammonium nitrate was decided upon as the only type of fertilizer which could be produced in sufficient quantities. There were available a number of wartime ordnance plants, idle with the close of hostilities, and readily convertible to the production of fertilizer grade ammonium nitrate.

The Act does not apply to "any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." Sec. 2680(a). This is a "highly important exception". H. Report 1287, 79th Cong., 1st Session, 1945, pp. 5 & 6. As Judge Woodrough, speaking for the Eighth Circuit, pointed out in Coates v. United States, 181 F.2d 816, 817, 818, 19 A.L.R.2d 840, "the term 'discretionary function or duty' has a long history of precise meaning in a legal sense". It was meant "to continue to exclude judicial authority from interference with lawful legislative and executive action". See also 56 Yale Law Journal, p. 545.

In the fields open to litigation before this Act was passed in 1946, such as suits against municipal corporations, against individual public officers, and suits before the Court of Claims, the courts had devised various legal formulas by means of which they scrupulously refrained from unwarranted interference with the legislative and executive departments of Government. As to municipal corporations see Barnes v. District of Columbia, 91 U.S. 540, 551, 23 L.Ed. 440; Harris v. District of Columbia, 256 U.S. 650, 41 S.Ct. 610, 65 L.Ed. 1146; 38 Am.Jur., Municipal Corporations, Sec. 578. As to public officers see State of Louisiana v. McAdoo, 234 U.S. 627, 633, 34 S.Ct. 938, 58 L.Ed. 1506; Standard Nut Margarine Co. of Florida v. Mellon, 63 App.D.C. 339, 72 F.2d 557; 43 Am.Jur. Public Officers Secs. 278–9. As to suits on contracts before the Court of Claims see Horowitz v. U. S., 267 U.S. 458, 461, 45 S. Ct. 344, 69 L.Ed. 736. The Act did not adopt the old distinction between Governmental activities of a sovereign nature and those of a proprietary nature. See Cerri v. U. S., D.C., 80 F.Supp. 831, 833; Somerset Seafood Co. v. U. S., 4 Cir., 193 F.2d 631. Instead, in line with its consideration of particular acts or omissions of employees of the Government, the Act drew a sharp focus on the jurisdictional exclusion, and forbade the courts to review "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government".

The addition to this exception of the terms "whether or not the discretion involved be abused" clearly evidences the intention of Congress that the legislative and executive branches of Government were to be free from any unwarranted judicial supervision. It is not necessary to determine how far Congress might have gone under the Constitution. It is sufficient to observe that in this Act the Congress prescribed limits in line with the wise and ancient landmarks that date from our earliest judicial history. Marbury v. Madison, 1 Cranch 137, 5 U.S. 137, 170, 2 L.Ed. 60. Much the same public policy forbids the courts to exercise jurisdiction over discretionary functions or duties of executive officers as protects the Government from being sued for the errors of the courts themselves in the exercise of their discretionary functions—See Cromelin v. U. S., 5 Cir., 177 F. 2d 275. In this case, it can hardly be argued that the dangers of explosion from FGAN were so well known prior to the disaster that judgment or discretion were not called into exercise as to whether it should be manufactured at all and under what safeguards and warnings it should be distributed. Even if some danger were recognized, the necessity of providing means of existence to the devastated areas might have called for the exercise of discretion as to whether to take a "calculated risk".

The very conception of negligence involves weighing the magnitude of the risk against the utility of the act or the particular manner in which it is to be done. 2 Am. Law Inst., Restatement of Torts, Sec. 291. The authority to determine and consider the factors as to the utility of the conduct and the magnitude of the risk (see same text, secs. 292 and 293) was vested in the executive officers or agents and not subject to the review of the courts.

We are clear to the effect that the court had no jurisdiction to review many, if not all of the acts or omissions of employees within the first group because they were exercising or performing a discretionary function or duty. Sec. 2680(a).

"Group II—Those who among other things negligently manufactured, sacked, shipped, transported, and distributed such fertilizer."

The employees in this group also were vested with considerable discretion. The plaintiffs complained that the United States was negligent in allowing FGAN to be bagged at too high temperatures. Determination of bagging temperatures was clearly within the discretion of the proper officers. A suggestion was made to the Chief of Ordnance that it would be better practice to bag the product at 120 degrees Farenheit rather than at 200 degrees. The commanding officers at the ordnance plants reported that this procedure would reduce production to less than half of that demanded by the fertilizer program and the world situation; and that the paper bags were not being damaged by the current practice. This was nothing more nor less than the exercise of the discretionary function by reaching conclusions on balanced considerations for which the United States are exempt from liability "whether or not the discretion involved be abused". Like considerations show the United States to be exempt from liability for various other steps in the manufacture and shipment of the product, such as the coating used for the fertilizer and its shipment in bags made from paper.

Distribution was as essential to the use of FGAN as its manufacture, and both called for the overall and authoritative determination at the highest policy level of the existence and degree of any dangerous qualities and of what precautions and warnings were necessary. Once that discretionary function or duty had been exercised or performed there ordinarily would be no duty upon subordinate officers or employees to review or revise the exercise or the failure to exercise such discretion. Any contrary rule would make a program of such magnitude impossible of accomplishment. The subordinate officers or agents are pro-

tected in the performance of their duty according to the directions of those vested with the discretionary functions or duties. See Moore Ice Cream Co. v. Rose, 289 U. S. 373, 381, 53 S.Ct. 620, 77 L.Ed. 1265, and cases there cited. As said in Sickman v. United States, 7 Cir., 184 F.2d 616, 620, "There is no allegation that any government employee failed to exercise due care in carrying out the determinations made by those granted the discretionary function."

Many, if not all of the acts or omissions of employees in this group come also within the exception of "any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid". Sec. 2680(a). While the exercise of due care is required to come within this exception, the negligence or wrong cannot inhere in the statute or regulation itself but must be in some act or omission not expressly permitted thereby.

Under the War Mobilization and Reconversion Act of 1944, Act of October 3rd, 1944, Chapter 480, 58 Stat. 785, 50 U.S.C.A. War Appendix, § 1651 et seq. the Director appointed by the President was authorized to make plans "to meet the problems arising out of the transition from war to peace" and to "issue * * * orders * * * to executive agencies" for that purpose.

By executive order, Order No. 9599 dated August 20th, 1945, 10 Federal Register 10155, as amended by Executive Order 9651 dated October 31st, 1945, 10 Federal Register 13487, the President directed all departments and agencies "concerned with the problems arising out of the transition from war to peace * * * to assist in the maximum production of goods and services required to meet domestic and foreign needs", by using "war plants and facilities."

Upon approval at the highest governmental levels,[2] and recommendations by the State and War Departments,[3] appropria-

2. Secretary of War Patterson "reported in substance this decision to the Cabinet" where it was "approved and the decision was to go ahead with this production."

3. Hearings before House Subcommittee on War Department Appropriation Bill, H. R. 3550, 79th Cong., 1st sess., p. 51; Public Law 126, approved July 3, 1945, 59 Stat. 384, 404.

tions for the fertilizer program were voted by Congress.[4] The War Department was ordered to carry it out, and the wartime plants were released to the Secretary of War by the Director of the Office of War Mobilization and Reconversion, to provide facilities for the production, through independent contractors, of some 90,000 tons of Fertilizer Grade Ammonium Nitrate (FG AN) per month.

"The discretionary authority of the Secretary of War was delegated down to" his subordinates, and he directed the Chiefs of Ordnance and Transportation and the Quartermaster General to carry the program into effect. These, in turn, established Standard Operating Procedures (SOPs) covering all phases of, and steps in, the proposed operation from the commencement of manufacture to shipment.[5]

The plaintiffs were under the burden of proving that the employees of the Government were acting within the scope of their office or employment. Sec. 1346 (b). Perhaps for that reason, there was virtually no claim that in the execution of the fertilizer program there had been any departure from the regulations, directives and orders. That fact brought the case within an exception to the Act. 28 U.S. C.A. § 2680(a).

"Group III. The United States Coast Guard, officers and men, who may have been among other things charged with some duty with respect to such fertilizer at the time of and after its arrival at Texas City and at the time of and after its explosion and the fires which followed. And including those charged with the duty of administering and enforcing Title 46 U.S.C.A. dealing with the shipment of dangerous explosives."

Some, if not all, of the duties of employees within this group come within one or the other of the exceptions to the Act already discussed.

The Act further limits the jurisdiction of the district court to cases involving "circumstances where the United States, if a private person, would be liable" 28 U.S. C.A. § 1346(b); and provides that the test of allowable claims is that governing liability of "a private individual under like circumstances". 28 U.S.C.A. § 2674.

The Supreme Court has held that recovery will be denied in cases in which "plaintiffs can point to no liability of a 'private individual' even remotely analogous to that which they are asserting against the United States." Feres v. United States, 340 U.S. 135, 141, 71 S.Ct. 153, 157.

There are no functions of private individuals comparable to those with which the Coast Guard is charged by statute. As to such functions of the Coast Guard, therefore, there can be no "liability 'under like circumstances,' for no private individual has power to conscript or mobilize a private army", Feres v. United States, 340 U.S. 135, 141, 71 S.Ct. 153, 157, or a Coast Guard which is "a branch of the armed forces of the United States at all times" 14 U.S.C.A. § 1. Furthermore, the evidence does not establish that the Coast Guard failed to perform any duty required of it under the circumstances.

The findings of the district court do not specifically relate to any employee of the United States any particular negligent or wrongful act or omission not within one of the exceptions to the Act. The district

4. See Military Appropriation Act, 1947, approved July 16, 1946, Public Law 515, 79th Cong., 60 Stat. 541, 560, and Hearings before the Subcommittee of the Senate Committee on Appropriations, held June 25, 1946, on H. R. 6837, especially memorandum by Secretary of War Patterson (p. 7), and testimony by General Eisenhower (pp. 16, 28), and Assistant Secretary Peterson (p. 85). "There is hereby authorized to be appropriated to the President not to exceed $350,000,000 for the provision of relief assistance to the people of countries devastated by war, such relief assistance to be limited to * * * fertilizer * * *". Public Law 84, 80th Cong., 61 Stat. 125, 22 U.S. C.A. § 1411 et seq.

5. "Standard Operating Procedures for the War Department Fertilizer Grade Ammonium Nitrate Program", "Plan for Ammonium Nitrate Production Program". "Standing Operating Procedure (Office of Quartermaster General) Distribution of Ordnance Produced Fertilizer Grade Ammonium Nitrate".

court took notice of the enormous length of the record and that, except for some records in the possession of the Federal Bureau of Investigation called for by plaintiffs and for the deposition of a witness denied to the defendant, all of the evidence had been produced that could be found or produced. From an examination of the record, we are of the opinion that the proof does not establish a case within the scope of the Federal Tort Claims Act, and that it would serve no useful purpose to remand this case for the taking of additional evidence.

The judgment of the district court is therefore reversed and judgment here rendered for the defendant.

Reversed and rendered.

STRUM, Circuit Judge (concurring specially).

I am in accord with the view that the Tort Claims Act confers no jurisdiction upon the courts to review or supervise the executive or legislative departments in the performance of their discretionary functions, and that the Act does not apply to "the exercise or performance or the failure to exercise or perform a discretionary function or duty". [28 U.S.C.A. § 2680.] I am further of the view, however, that when even a discretionary duty or function is undertaken, due care must be exercised in its performance, failing in which the United States is liable for the acts of its employees, within the scope of their authority.

Whether or not a project shall be undertaken, or the policies to be followed in executing it, may be discretionary, and as to those things there is no liability or review under the Tort Claims Act. But if a discretionary project is undertaken, then the United States is held to due care, to the same extent as a private individual. So it is here. The government need not have undertaken the manufacture of FGAN at all. Whether or not it did was discretionary, and it would be subject to no liability for declining. Having undertaken the function, however, it is held to due care in its performance, even though it had a discretionary choice as to whether it would undertake it.

Though the complaint asserts that there was a failure to exercise due care in the manufacture, labeling, and handling of the FGAN, and in failing to give warning of its explosive character, the allegations in that respect clearly are not supported by the evidence. There is no evidence of any circumstance which would indicate to a reasonably prudent person that fertilizer grade ammonium nitrate (FGAN) would be likely to explode, due to its inherent qualities, if dealt with in a normal manner. It did not explode here under normal conditions, but only when too closely confined on the ships, with which the United States had nothing to do.

The government was manufacturing, not an inherently dangerous explosive such as gun powder, dynamite, or the like, but fertilizer which was safe if dealt with normally. The evidence is that ammonium nitrate is not inherently an explosive, but that it becomes explosive only when combined with other explosive compounds, such as T. N. T., or other nitrated organic bodies. When not combined with substances such as these, it constitutes only a fire hazard. In other words, it will burn but not explode. There is no evidence that in the manufacturing, sacking, or transportation of this FGAN to shipside, there was any failure to use ordinary and reasonable care. Nor did the FGAN explode while being transported in railroad cars to shipside.

It is also clear to me that the explosion was due, not to the inherent qualities of the FGAN, but to faulty stowage on the ships, a delinquency not chargeable to the United States. The United States is not an insurer here. It is held only to the exercise of reasonable care. The paper sacks containing this FGAN were plainly labeled in large letters: "Fertilizer-Ammonium Nitrate-Nitrogen 32.5%." This was sufficient to put the ship operators on notice as to the nature of the substance they were handling. The evidence definitely and firmly convinces me that the proximate cause of the explosion was not the inherent nature of the fertilizer, nor any lack of due care in its manufacture, labeling, or transportation to shipside, but that it was im-

properly stowed in too compact a mass, confined between decks, so that the rising temperature produced by such faulty stowage caused it to explode. The United States is not chargeable with the faulty stowage. As stated, the bags were clearly labeled "Fertilizer-Ammonium Nitrate-Nitrogen 32.5%." It is true that the bags were not labeled "Explosive." But there was no known instance of a previous explosion of FGAN under normal conditions. This explosion was wholly unprecedented. Prior to this disaster, there had been no known instances of explosions during land transit, while in stowage awaiting export, in the many shiploads previously shipped overseas, nor in this FGAN while part of it was stacked at the Texas City Terminal awaiting loading.

The finding of the district court that the explosion was due to the inherently dangerous character of the FGAN, and that it was the duty of the United States to have given a more adequate warning of its dangerous character, is clearly erroneous. Although there may be some evidence to support the finding, the evidence when appraised as a whole creates with me "the definite and firm conviction" that the United States was not guilty of negligence, but that the negligence which caused the explosion was wholly and solely that of the ship operators, who were not agents of the United States. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765, 766.

In cases where a manufacturer has been held liable for the explosion of some bottled or canned product, or for damage caused by some other processed product, liability has always been conditioned upon the normal handling or use of the product. Where, as here, the product has been subjected to some abnormal treatment, such as stowing this fertilizer too compactly in a confined space between decks, the abnormal treatment, not the inherent qualities of the product, is the proximate cause of the damage. In such circumstances, there is no liability upon a "private party" manufacturer, hence none upon the United States.

Nor is there any basis in the evidence upon which the United States can be charged with negligence because of acts or omissions of the Coast Guard in the circumstances shown.

As there is no claim that there is any other evidence which would change the result, there would be no advantage in remanding the cases for a new trial. I therefore concur in the judgment of reversal, and in the rendition of judgment here for the United States.

HUTCHESON, Chief Judge, with whom BORAH, Circuit Judge, joins Concurring in part and Dissenting in part:

I concur in the view of the majority that the judgments appealed from cannot stand and must be reversed.

I dissent, however, from the reasons given for the reversal and also from the rendition of the judgments for defendant.

Of the clear opinion that the judgments should be reversed and the causes remanded for a retrial, freed from the errors that attended the former trial, I am, as briefly as possible, stating the reasons for my opinion.

### Appellants' contentions

Appealing on an enormous record from judgments based on profuse, prolific, and sweeping findings, all of which, stemming from the basic conclusion of the district judge,[1] taken together, give blanket support to all of plaintiffs' contentions and reject all of those advanced by it, defendant below, appellant here bases its case for reversal on three broad propositions.

The first of these propositions is that the case made, taken at its best for plaintiffs, is not sufficient to fasten liability upon de-

---

1. "Record discloses blunders, mistakes, and acts of negligence, both of omission and commission, on the part of the defendant, its agents, servants, and employees, in deciding to begin the manufacture of this inherently dangerous Fertilizer."; that by the manufacture of FGAN, the United States "was creating and maintaining a nuisance", and that "each shipment of such Fertilizer was a dangerous public and private nuisance from the time it was manufactured."

fendant for the reason that what is complained of as a tort, for which the United States has made itself liable by statute, is not such, and, since the basis of the liability must be found in the statute, plaintiffs cannot recover.

In support of this fundamental theory, the appellant takes two positions. The first is the affirmative one, that the claims asserted are negatived by the act as they fall within specific exceptions from the reach of the statute, that is, they are claims based upon (1) "the exercise or performance or the failure to exercise or perform a discretionary function or duty"; or (2) "an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation". The second is the negative one that the claims asserted are not brought within the affirmative requirements of the act that claims must be based upon (a) *respondeat superior* arising from an identifiable employee's negligent act or omission"; and (b) "an act or omission for which 'a private individual under like circumstances' would be liable."

The second of appellant's propositions is further subdivided into two. One of these is that, assuming that the case pleaded and sought to be made is one which, if made out, would entitle plaintiffs to recovery, the judgment was wrong and must be reversed and rendered, because: (a) the defendant had nothing to do with, and was in no way responsible for, the material after it had been loaded on the cars; (b) the evidence shows as a matter of law that the title and control of the material had passed from the defendant when the accident occurred; and (c) as matter of law no negligent act of an employee of the defendant is shown which would, if defendant were a private person, make him liable.

The other is that, if the judgments are not to be reversed and rendered, they must be reversed and remanded, because the findings convicting defendant's employees are clearly erroneous. In support of this view, the appellant insists: that the force

and effect of the testimony, considered as a whole is convincing that the findings are so against the great preponderance of the credible evidence that they do not reflect, or represent, the truth and right of the case. Sanders v. Leech, 5 Cir., 158 F.2d 486. Or, putting it as the Supreme Court has put it in United States v. U. S. Gypsum Co., 333 U.S. at page 395, 68 S.Ct. at page 542, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Appellant's third proposition, which is, in treatment, necessarily intertwined with its second above, is that the method and manner of the trial including particularly the advocative violence of the committee, so infected the case with error that instead of having its liability *vel non* determined in the calm judical atmosphere of a trial, in which appellant was accorded its full procedural rights, and the members of the committee were held to those, to which they were entitled, this was determined in an atmosphere of bickering and contention and by the use of trial procedures which denied it a fair trial. It insists, in short, that the trial was permitted to go so out of bounds[2] that the findings cannot be approved, the judgments cannot stand.

Appellees counter contention

*Appellees take full issue with appellant on these propositions.* On the first proposition, their position is that the terms of the statute and the decisions of the Supreme Court and of the Courts of Appeals, in effect declare that the liability of the United States, in connection with the fertilizer involved in this case, was, and is, properly measured by the liability controlling a private manufacturer of, what appellees say was, an inherently and imminently dangerous, and ultra hazardous, material and commodity.

Insisting that the statute in authorizing suit did not limit the right to sue except as precisely set out in the exceptions, appellees particularly urge upon us that since the statutory exceptions do not specifically

2. Cf. Maryland Cas. Co. v. Reid, 5 Cir., 76 F.2d 30.

exclude liability as a manufacturer, appellant's position on this point is without basis. Pointing to the broad terms of Sec. 2674, Title 28, "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances", appellees insist: that the United States must be held liable in the case of manufactured articles as a private manufacturer would be; and that, since a manufacturer is held liable without fault for putting dangerous articles on the market, which cause injury, the United States must also be held liable without fault. In the alternative, they argue that if it is necessary to prove fault in the sense of negligence or wrong doing on the part of individuals, they have proven this by pointing out the derelictions of named persons in regard to the manufacture and shipping, the labelling for shipping, and the failure to advise persons who might come in contact with the fertilizer of its dangerous character. So insisting, they say that it is immaterial whether liability without fault is imposed here, as is imposed upon manufacturers of dangerous articles, or liability is imposed for negligence of particular persons.

When it comes to appellant's second proposition, the state of the evidence, appellees insist: *that the evidence is all one way on the issue of negligence; that in fact negligence is established as a matter of law; and that there is no credible evidence to the contrary. They insist, therefore, that the question of errors in the conduct of the trial or in the making of the findings must be disregarded as completely harmless, since, under the evidence, a verdict for them was demanded as a matter of law.*

In the alternative, they urge: that if the findings were not demanded as a matter of law, there was certainly ample evidence to support them; that it cannot be said that they were contrary to the truth and right of the case; and that this being so, they may not be set aside as clearly erroneous.

Upon appellant's third proposition, the procedural points urged, they insist that in the main the district judge precisely followed prescribed procedure, and in the rulings that he made, or did not make, he committed no error. They urge further that if any error was committed, it was harmless since the district judge took the evidence with the case and, though he declined to rule when requested and later he ruled against appellant on many of its objections, he made it clear in his findings: that, in arriving at them, he did not attach any weight or importance to the evidence admitted or excluded by him over defendant's objection, and that the judgment was based only upon evidence wholly unobjected to and undisputed, which fully supported his findings.

They insist, therefore, that the judgments *must be affirmed, on the ground that, as a matter of law, the defendant was liable, as DuPont, or Lion Oil Co., or other manufacturers of fertilizer, would have been for putting out an inherently dangerous article, without taking adequate steps to prevent its becoming dangerous to persons who should come in contact with it, and without giving adequate warning of any dangers that might inhere in it.*

### Appellant's reply

The appellant, while meeting all of these contentions head on, presses hardest upon us, as its primary point: that it was not intended by the statute to make the United States liable except in the special case of specific negligent conduct by specific agents in respect of matters not excluded by the exceptions; that the statute precisely excluded liability without fault, and limited the liability of the United States to cases of specific acts of negligence by specific employees.

Further insisting that the statute was not intended to introduce new and strange liabilities, such as the liability without fault of a manufacturer, and that the whole doctrine of manufacturer's liability is wholly inapposite and inapplicable to the United States, as a tort feasor under the Act, appellant further argues that it cannot be said upon this record: that the evidence established its liability as matter of law; that it showed that the agents of the government charged with the manufacture and

handling of the fertilizer knew, or were charged with knowledge, of its propensity to explode, and failed to take adequate precautions against, or warn people of, this propensity. They particularly insist: that this is a case of hindsight teaching foresight; that the district judge based his finding of liability for the Texas City explosion, which, when it occurred was a completely unlooked for, unprecedented and wholly unforeseeable occurrence, indeed a nine days' wonder, not upon facts then known and understood, but upon experiments and investigations made afterwards, and upon the erroneous view that these experiments, and the testimony of witnesses who made them, were admission against interest of appellant.

*Appellant points out: that it is fundamental law that negligence must be proved and not presumed; that the standard is not insurance, but the exercise of due care; that the foreseeability required is not an absolute foreseeability, but the foreseeability of a reasonably prudent person.*

So pointing, it insists that, except for the worked up tension and excitement in the case, because of the size of the explosion and the large amounts being sued for, the findings would not have been made; that, in short, had this been a small case of a small loss, no one would have found the defendant negligent for not knowing what nobody else knew until after the explosion and the Picatinny and other tests were made; and that the findings must be disregarded as clearly erroneous because contrary to the great weight and sense of the testimony taken as a whole.

Finally, it urges upon us that, if all the evidence that was admissible had been allowed to come in, and all that was inadmissible had been kept out, and the really admissible evidence supported the findings, the case was yet tried under such pressures and in such an atmosphere and the procedures adopted and carried out through the trial present so many errors, both of omission and commission, that the trial and the findings are deprived of effect, and defendant is entitled to have the issues, presented by the pleadings and the evidence, retried. Pointing out that this is especially necessary in this case when the result of so many suits were made to depend upon the decision of one trial, appellant insists that for this trial to stand, as the standard and measure of liability in all of these cases, is to work a complete perversion and denial of justice, and that if the case is not reversed and rendered, there should certainly be a reversal and remand.

As a last resort, it complains of the fact that the court attempted to start interest running on all the claims by entering judgment settling liability on all of them before any adjudication on the amounts thereof had been had.

Approaching these claims and counterclaims from the small end of the telescope, I am of the clear opinion that appellant is right in its attack upon the judgments as providing for interest in violation of the statute before the amounts have been determined, and that to that extent the judgments should be reversed. I am also of the clear opinion that the judgments must be reversed for procedural errors inherent in the way and manner in which the case was tried.

Particularly erroneous and prejudicial were (1) the refusal of the court to allow the government to take depositions because it would not turn over to the plaintiffs the F. B. I. records; (2) the admission of the Picatinny and other arsenal tests and testimony as admissions against the interest of the government; and (3) the conduct of the trial generally with undue limitation of the procedural rights of the defendant and undue enlargement of the procedural rights of the plaintiffs.

The next step which the appellant urges us to take, to downrightly hold that, procedural errors aside, the findings are clearly erroneous, would not, if it were not for the procedural points, be so easy to take. Because, however, of the way the case was tried, because, too, of the too sweeping nature of the findings and conclusions, I agree with the appellant that the findings are contrary to the truth and right of the case and clearly erroneous, and that the judgments should, therefore, be reversed and the cause remanded for trial anew.

When it comes to the final step which appellant urges us to take, to reverse and render because no recoverable claim was alleged, or, if alleged, as a matter of law none was proven, I find myself unable to take the step. It seems to me that a case against the government was pleaded and that if the trial had not been marred by errors of procedure in the reception and rejection of evidence and in other respects, there was evidence which, if believed, would have been sufficient to sustain a recovery.

Judge Rives has, in his opinion, put the case for the government, as to its non liability as matter of law, as well I think as it could be put, and, if I could agree with his primary position, I should agree with his conclusions. I find nothing, however, in the statute itself, nothing in any decided case, which, in my opinion, supports the application of the views advanced by him to facts of this kind. What was said in the Sickman case, 7 Cir., 184 F.2d 616, about discretion does not, in my opinion, carry the matter to the point Judge Rives' opinion seems to me to carry it, that because of the discretionary character of the operation, the government would not be liable for negligence in the higher echelons; and that if persons in these should direct the doing of something in its nature completely dangerous, there could be no responsibility in tort for what was done or not done in connection with it.

As I understand the reasoning it is that, since the matter was within the discretionary sphere, neither those who gave the orders, nor the government, would be responsible, and, therefore, neither those who carried out the orders exactly as given nor the government could be responsible.

I am in no doubt that the district judge erred in holding that the program was in its nature so dangerous that it constituted a public nuisance and its mere undertaking was wrongful. Neither am I in any that the appellees are wholly mistaken in claiming, as they do at page 195 of their brief, that the government can be held liable without fault for putting out an ultra hazardous material.

I find it very difficult though to understand how, under the precise language of the Tort Claims Act, liability can be escaped if it is made to appear that the act or omission of an employee of the government in the execution of a statute or regulation was not in the exercise of due care.

It seems to me that such decisions as we have rendered under the Tort Claims Act, St. Louis, etc. v. U. S., 5 Cir., 187 F.2d 925, and Costley v. U. S., 5 Cir., 181 F.2d 723, are contrary to this view. It seems to me, too, that all of the decisions of the Supreme Court and of the other federal courts, which I have read, are in favor of a broad construction of the act and against what seems to me the extremely narrow view invoked and applied here.

In the situation, then, in which I find myself, I am compelled to dissent from the opinion of the majority that no case was stated on the pleadings, and, as matter of law, none was made out. I think the contrary is true, and that a case was stated on the theory: that the product was ultra hazardous and dangerous; that this was known, or, in the exercise of due care, ought to have been known; that a reasonably prudent person, therefore, manufacturing and putting it out, as the United States was doing, ought to, and would have known its liability to explode and would have given more warning of that fact than was done here. I think too that if, on a retrial, the proof makes out the case alleged, the United States must be held liable as Hercules Powder Co. or DuPont Co., or any other private manufacturer would be, not for having undertaken to make FGAN, or even for making and shipping it as it did, *but, if it did not, because it did not*, give the warnings required of a reasonably prudent person to put people dealing with it on notice of its character and the dangers of dealing with it.

I am in no doubt, though, that, because of the procedural errors attending the trial, and because the sweeping findings and conclusions are, upon this record, clearly erroneous and cannot stand, all of the judgments must be reversed and the causes remanded for further and not inconsistent proceedings.