James M. SULLIVAN, Plaintiff,

v.

UNITED STATES of America,
Defendant,

Kenneth F. RUMSEY, Third-Party
Defendant.

Civ. A. No. 67–296.

United States District Court
N. D. Alabama,
Western Division.

July 26, 1968.

Frank W. Riggs, III and Truman Hobbs and Hobbs, Copeland, Franco, Riggs & Screws, Montgomery, Ala., for plaintiff.

Macon L. Weaver, U. S. Atty. and E. Ray Acton, Asst. U. S. Atty., Birmingham, Ala.,; Carl Eardley, Acting AG Civil Division; John G. Laughlin, Chief, Torts Section; and William L. Morrow, Atty., Civil Rights Division, U. S. Department of Justice, Washington, D. C., for defendant.

Hubbard H. Harvey, Demopolis, Ala., for third party defendant Kenneth F. Rumsey.

## OPINION IN LIEU OF FORMAL FINDINGS UNDER RULE 52

GROOMS, District Judge.

### I.

This action is brought by the plaintiff, James M. Sullivan, under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2674. Kenneth F. Rumsey was made a third-party defendant on motion of the United States. The third-party defendant has filed a counterclaim also seeking damages under the Federal Tort Claims Act.

Shortly before May 22, 1965 arrangements were made with the Rudder Flying Service, a charter and agricultural flying business in Greensboro, Alabama, to fly the plaintiff and three other rodeo performers from Mobile, Alabama, on the afternoon of said date, to a rodeo in Moulton, Alabama, with return trip planned for the same night. This was the first time that the plaintiff had ever flown in an airplane. When the pilot Rumsey arrived in Mobile, plaintiff and his three companions boarded the plane and left on the trip for North Alabama. The pilot flew directly to Moulton, but since it had already gotten dark and there were no lights on the air strip at Moulton, he then flew to nearby Decatur. The airport at Decatur was lighted, and no difficulty was experienced by the pilot in landing the plane at that airport. The pilot and his four passengers went by automobile to Moulton, and after the performance at Moulton, returned to Decatur about midnight. The plaintiff and one or two others wished to return to Mobile, the plaintiff having made plans to meet his wife at that place.

The passengers were told by the pilot that a refueling stop would be made at Tuscaloosa. As Rumsey approached Tuscaloosa, he made an attempt to contact the Tuscaloosa Flight Service Station by radio to get routine information concerning the runways in use and weather reports. This attempt was unsuccessful. On the plane's arrival at Tuscaloosa, the airport runway was dark and the pilot was unable to attract the attention of anyone on the ground to light it. After circling the field twice at low altitude, and twice passing over the hangar without any success in getting runway lights, Rumsey concluded that he had to attempt a landing without lights since his gas gauges had shown "empty" upon his approach to Tuscaloosa. Being unable to see the runway in the darkness, he misjudged it and crashed approximately 800 feet short of the western end of the runway. The plane, in the attempted landing struck an automobile and was largely demolished. The plaintiff received grievous injuries and Rumsey also received serious injuries.

Dominick J. Bizzoco was on duty at the Tuscaloosa Airport which is known as Van de Graaff Field. He was an employee of the Federal Aviation Administration, an agency of the United States. He testified that he did not receive any radio call from the incoming plane and did not hear it circling the airport. Consequently, he did not turn on the lights. The switch to the lights was available to him in the control room. The Federal Aviation Administration is reponsible for the operation of the runway lights at the airport. The person on duty in the control room can only see the east end of the runway from the control room. At the Request of the FAA the control room had been insulated with acoustical tile to the extent that it would be extremely difficult to hear the noise of circling planes. The purpose of this insulation was to keep down the noises inside the Flight Service Station. The fact that the room was insulated partly explains the reason why Bizzoco did not hear the circling plane on the occasion of the accident. Bizzoco had never tried to hear a circling aircraft and did not consider it his duty to light up the field for a circling aircraft.

Mr. Phillip B. Massie, an aviation consultant, who lives near the airport testified that he had called the Flight Service Station on several occasions when he heard circling aircraft which had not been heard by the Flight Service attendant at the field.

The control room had multiple inside noises including radio, air conditioning, and teletype. This room was in the rear of the building away from the flying field. This was at a point where Bizzoco would have a very limited view of the field and limited opportunity to see the lights of a circling aircraft.

The United States Department of Commerce Coast and Geodetic Survey had issued a Birmingham Sectional Aeronautical Chart, a copy of which Rumsey had consulted before leaving Greensboro in preparation for the flight. The chart contains a legend at the location of the Van de Graaff Field as follows: 169 L 40 U. By referring to the aeronautical symbols on the reverse of the chart, the 169 indicates the elevation, L indicates lighting, and the 40 the length of the longest runway in hundreds of feet, and the U indicates aeronautical advisory station licensed to operate on 123.0 mc at airport with control tower. The L is defined as follows:

"L ——— Lighting $\begin{cases} \text{L} - \text{Lighting available Sunset to Sunrise} \\ *\text{L} - \text{Lighting available Sunset to Sunrise on request} \\ \text{(L)} - \text{Lighting available part of night only''} \end{cases}$

There is no cross reference in this part of the chart to any qualification that might appear on the other parts of the chart. On another section [1] of the chart it is stated that lighting is available "Rnwy, per request FSS", the FSS being the abbreviation for Flight Service Station.

After the last commercial flight into Van de Graaff Field about midnight, the lights are turned off. In examining the various airports, including the Birmingham airport, it is found that the letter L is generally used without the asterisk or parenthesis, but at certain airports the asterisk or parenthesis is employed. For example, the asterisk precedes the L at Fayette. The L is in parenthesis at Fuller airport, near Marion.

The Airman's Information Manual which was available to Rumsey and with which he obviously had some familiarity, and which was in effect at the time of the accident, provided in pertinent part as follows:

"L: Lighting—An Asterisk (*) preceding an element indicates that it operates on prior request only (by phone call, telegram or letter). Where the asterisk is not shown, the lights are in operation or available sunset to sunrise or by request (circling the field or radio call.)"

The Flight Assistance Service Manual places the duty of operating the runway lights on the operator in the Flight Service Station. Paragraph 713.5 provides that the attendant shall—"in addition as applicable control the landing direction indicator and the field lighting system". Paragraph 714.5 provides as follows:

"Adequate arrangements shall be made for operating field lighting. Station personnel shall operate controls when the following circumstances exist:

"A. The controls are extended into the station without expense to the FAA and are located conveniently to the operating position.

"B. The operating quarters afford a sufficient view to determine the operating status of the lights without the specialist having to leave his post of duty"

Both conditions A. and B. for the Flight Service Station operator to operate the lights were present.

The Federal Aviation Agency's "Handbook of Facility Operation", Paragraph 206.1 provides that "Each employee shall be familiar with the duties of his particular position and with the duties of subordinate employees".

Plaintiff contends that the defendant, acting through its employees who were acting within the line and scope of their employment, (1) negligently published and distributed an erroneous and misleading chart, and (2) negligently failed to turn on the lights at Van de Graaff Field.

Plaintiff says that the defendant's negligence in the latter particular resulted primarily from the defendant's act in placing its employee in charge of the operation at the airport in an insulated room where he could not hear a circling aircraft and could not see one, except with great difficulty. He says further that the employee was not acquainted with The Airman's Information Manual respecting the circling of the field as notice to the attendant to turn on the runway lights, nor was he acquainted with the general practice in this respect, and, as a matter of fact, did not know the turning on of the lights under such circumstances fell within the ambit of his duties.

The defendant denies any negligence in these or in any other particulars; and as to the preparation and publication of the chart says that such acts would constitute a "misrepresentation" and would fall under the exception of Section 2680(h). Further that the placing of false information on the chart was a discretionary function and came within the exception of § 2680(a). Likewise, that

---

[1]. This section lists 109 airports in Alabama and Georgia, including Van de Graaff, where sundry data is noted.

the location of the insulation of the Flight Service Station is within the latter exception.

Without attempting a detailed analysis of the authorities dealing with the exceptions set out in § 2680(a) and (h) of the Tort Claims Act, the Court is of the opinion that under the applicable authorities, the acts here complained of do not fall within the scope of the sections referred to. United States v. Neustadt, 366 U.S. 696, 81 S.Ct. 1294, 6 L.Ed.2d 614; Wenninger v. United States, 234 F.Supp. 499, (aff'd 3rd Cir.) 352 F.2d 523; United Air Lines v. Wiener (9th Cir.) 335 F.2d 379; Somerset Sea Food Co. v. United States (4th Cir.) 193 F.2d 631; Ingham v. Eastern Air Lines (2d Cir.) 373 F.2d 227; Eastern Air Lines v. Union Trust Company (Court of Appeals, D.C.) 221 F.2d 62, affirmed 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796, on authority of Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; American Exchange Bank of Madison, Wis. v. United States (7th Cir.) 257 F.2d 938; Jemison v. The Duplex (So.Dist. of Ala.) 163 F.Supp. 947.

The chart for the Tuscaloosa airport shows the unadorned symbol "L". The legend on the chart explains this to mean "lighing available sunset to sunrise." The legend further shows that if the "L" is preceded by an asterisk (*L), the symbol means "lighting available sunset to sunrise on prior request". The legend does not tell the pilot that an airport showing a symbol "L" may not be lighted when he arrives during the night time. The explanation of the symbol "*L" by stating that one must request lighting at an airport so marked, suggests that no request of any kind is necessary where the unadorned "L" is the symbol employed. The symbol "L" applies to Birmingham and other major cities on the chart. These obviously have lights all night. Upon consulting the chart, one would likely assume that the Tuscaloosa airport having a common symbol would have common accommodations with respect to runway lights. By employing the letter "L" at Tuscaloosa to a situation where the lights are turned off after the last commercial flight, and to Birmingham where they burn continuously, the chart did not mean what it plainly indicated. The legend contained no cross reference that would direct the pilot's attention to any qualification of the unadorned symbol "L".

The Airman's Information Manual indicated that the unadorned "L" may have two meanings by stating that if the field was dark when the pilot arrived, he could obtain lights by circling the field.

For many years a recognized and acceptable way for a night flying pilot to get the runway lights turned on has been to circle the field. For the pilot without a radio[2] or a radio that has gone dead, circling the filed was the only way to get the runway lights on. The practice was formerly expressed in the Airman's Information Manual. The negligent acts and omissions of the agent of the defendant made it impossible in this instance to carry out the policy which had been so set by the F. A. A.

When the defendant, through its chart, undertook to supply vital information to pilots, it assumed the duty of discharging this function in a non-negligent manner. In Indian Towing Company v. United States, Supra, where due to the failure of the lights on Chandeleur Island the tug Navajo went aground, the Court said:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give

2. Assuming that no other pre-flight arrangements for lighting had been made.

warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

For application of the rule to the negligence of an airport controller employed by the Federal Aviation Agency, see Hartz v. United States, 5 Cir., 387 F.2d 870.

When the defendant published the chart here involved and made the same available for use by pilots, it thereby induced reliance thereon on the part of Rumsey and all other pilots using the chart.

■ The Court is of the opinion, and so finds, that the preparation and circulation of the chart were operational tasks, and that these tasks were negligently performed by defendant's employees.

■ The Court is of the further opinion, and so finds, that the defendant was negligent in stationing the attendant in charge in a room so insulated that he could not hear a circling aircraft, and in a room so located that he could not see the lights of such an aircraft. Further that said attendant had negligently omitted to familiarize himself with the duties required of him with respect to turning on the lights by request as that request was made known in circling the field. The Flight Service Assistance Manual states flatly that "adequate arrangements shall be made for operating field lighting". The manual places the duty of operating the runway lights squarely on the operator in the Flight Service Station. The operator negligently failed in his duty to turn on the lights. Such negligent failure was the end result of the other acts and omissions to act above adverted to. Such acts and omissions to act were operational in nature and did not involve the exercise of discretionary functions on the part of the defendant.

The negligence of the defendant's employees in the particulars hereinabove indicated proximately resulted in plaintiff's injuries and damages.

■ Plaintiff was asleep at the time of the accident and was himself guilty of no contributory negligence. Any negligence of Rumsey, the pilot, will not be imputed to him. Stork v. United States (S.D. California) 278 F.Supp. 869, 881. There was no joint adventure.

Under the evidence and the authorities herein referred to, the plaintiff is entitled to recover for his injuries and damages.

■ Plaintiff was 26 years old at the time he received his injuries. He was an active, agile, well-coordinated, athletic type of individual with a great deal of interest in horses. For several years he had been a rodeo performer and had achieved rather marked success in this area. He also trained, shoed and cared for horses. He also averaged better than $8,000.00 a year from his several pursuits, and during the year immediately preceding his injury, his rodeo earnings alone were from between ten to $14,000.00. He was earning $100.00 a month from the training of horses, and was boarding several horses for which he was receiving from forty to $50.00 per month, and made some profit on this operation. He was also shoeing horses and received income from this job. Up to the time of the trial, he had lost three years' earnings of a minimum of $8,000.00 a year. There is every reason to believe that his income from his rodeo performance would have increased, and that he could have followed this pursuit until he was forty. The Court finds that he will lose at least another twelve years' earnings at a minimum of $8,000.00 per year; and that thereafter, until age 65, his loss of earnings will be at least $2,000.00 per year.

Plaintiff was married and had a young daughter who is now eight years of age. He had never had any illnesses other than childhood diseases, and was an even-tempered individual. He is a high school graduate.

Plaintiff was taken from the place of his injury on the early morning of May 23, 1965, to the Druid City Hospital in Tuscaloosa. When the family physician, Dr. George C. Murchison, Jr., arrived at the hospital, the plaintiff was under the care of Drs. Brock and Fernandez. He was unconscious; a tracheotomy tube had been inserted in his throat to aid breathing since his innercranial injuries interfered with that function, as well as with his ability to swallow. A complete physical and neurological examination revealed superficial injuries to the extremities, including a long cut on one arm, and severe injury to the brain. His temperature went up to 105½, and it was necessary to put him in an ice blanket for forty hours. He was given oxygen therapy, antibiotics and intravenous fluids and medication to control his blood pressure. The first endeavor of the physicians in the early phases of the treatment was to save his life. He had almost continuous convulsions for a period of almost 48 hours following the injury, and intermittent convulsions for 10 days thereafter, which re-occurred from time to time during his hospital confinement. The lambodial suture line on the left side of his skull was separated. He was removed from the Druid City Hospital on June 9th to the Baptist Hospital in Montgomery. He regained partial consciousness after about five and one-half weeks. His memory did not return to him until July 17th. He remained in the Baptist Hospital until July 31st, and was totally disabled during all the period of his hospital confinement. He was unable to walk, and his right arm and leg were paralyzed. He required continuous nursing care while in the hospitals, and a male nurse accompanied him to his home for further nursing care. As soon as he had regained some locomotion, a re-training procedure was begun. However, he began to suffer from periods of severe depression, terrific temper tantrums and convulsive seizures. He has been continuously on dilantin and phenobarbital, which are anti-convulsants. He has suffered visual disturbances and is now required to wear glasses. He is unable to walk in a normal manner. He cannot use his right hand to perform fine movements. In order to raise his right arm, he has to raise his right shoulder. He cannot control his right foot or right ankle, and he speaks with difficulty. He sustained a brain injury, and this injury has resulted in the conditions outlined. He has been rendered unable to adequately express himself sexually without being animalistic. This has affected his married life, and his wife has divorced him. His memory of the flight on which he was injured has been blotted out. Some of his memory loss will be permanent. From time to time up until Christmas, 1967, or the early part of January, 1968, the plaintiff showed suicidal tendencies; and during the latter period became definitely a suicide risk. He was hospitalized as a mental patient in the Jackson Hospital in Montgomery where he received psychiatric treatment for a period of some ten days. He benefited from the treatment. About February 1, 1968, he became more emotionally stable. He is completely disabled as a rodeo performer. He is right-handed, and is having to re-train himself to write with his left hand. The object of the over-all re-training is to try to equip him to develop a skill from which he can at least partially earn his own way. His mother is supporting him at this time while an attempt is being made to re-train him at one of the state training schools. He is 60 per cent disabled, without regard to his former work as a rodeo performer. According to the medical testimony, his condition will not improve, and he has reached his maximum recovery. His disability is permanent.

The plaintiff has incurred medical, hospital, and nursing bills of a reasonable value of $11,336.00.

The plaintiff is entitled to recover for the expenses which he has incurred, and for the earnings which he has lost and will lose as hereinabove indicated. He is also entitled to recover for pain and suffering, past, present and future, and for

the mental and physical disabilities which he has suffered.

The damages which the plaintiff is entitled to recover are as follows:

1. Medical, hospital, and nursing bills incurred to date . $ 11,336.00
2. Loss of earnings for three years since injury . . . . . . . 24,000.00
3. Future loss of earnings through age 40 including loss as rodeo performer . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96,000.00
4. Future loss of earnings from diminished earning capacity from age 40 through 65 . . . . . . . . . . . . . . . . . . 50,000.00
5. Past and future physical and mental pain, anguish and distress, depression, discomfort, disabilities, and impairment of speech, vision, locomotion, reasoning, emotional control and normal sexual life . . . . . . . . . . 125,000.00

Total . . . . . . . . . . . . $306,336.00.

## II.

Kenneth Rumsey, who was the pilot of the ill-fated plane, had been flying since 1952, and up to May 23, 1965, had logged a total of 240 hours. On the occasion here involved, he was flying a Beechcraft Bonanza plane. This plane had seats for three passengers in addition to the pilot. Four passengers were picked up on the flight. However, they had little, if any, baggage, and the plane was not overloaded. This plane had a cruising speed of from 140 to 160 miles per hour, and a landing speed of from 75 to 80 miles an hour. The plane was equipped with three gas tanks, a right, a left, and a reserve tank. The plane had a capacity for 46 to 47 gallons of gas. The tanks were filled at Greensboro, but the contents of the reserve tank was used on the flight from Greensboro to Mobile. No attempt was made to re-fuel the plane at Mobile, and the refueling facilities at Decatur were closed. The plane was equipped with landing lights. Rumsey had made night landings. He had been at the Tuscaloosa Airport on many occasions during the daytime, but had never made a night landing at that airport. The plane was equipped with two radios, a receiving radio and a transmitting radio. The transmitting radio was on a frequency of 117.8, and Rumsey stated that he had contacted the Tuscaloosa Airport on this frequency on previous occasions. After the accident, it appears that the transmitting radio was on 118.3, and the receiving radio on 117.8. The Government's testimony is that a transmission on the frequency referred to would not be received at the Tuscaloosa Airport.

Rumsey held a student's license, which did not authorize him to carry passengers. He concedes that in a number of respects that he did not comply with the Federal Aviation Regulations. For example, these regulations provide (61. 47(a) (b) ), that no person may act as a pilot in command of an aircraft carrying passengers unless within the preceding 90 days he has made at least five take-offs and landings to a full stop in an aircraft of the same category (a). And that no person shall act as a pilot in command of an aircraft carrying passengers at night-time unless within the preceding 90 days he has made at least five take-offs and five landings to a full stop during the night (b). The regulations further provide (61.73) that a student pilot may not act as a pilot in command of an aircraft carrying passengers for compensation. 135.21 of the regulations with reference to pilot qualifications provides that no person may act as a pilot in command of an aircraft at night unless he has had at least 500 hours of

flight time as a pilot, including at least 100 hours of cross-country flight time, at least 25 hours of which were at night. There are other regulations which it is charged that Rumsey violated. However, before the violation of these regulations would constitute contributory negligence on his part, it must be shown that such violations proximately contributed to his injuries and damages. The Court does not find that these regulations so contributed, with one exception. 135.97, which deals with fuel supply provides as follows:

"(a)  No person may begin a flight operation in an airplane under VFR (Visual Flight Rules) unless, considering wind and forecast weather conditions, it has enough fuel to fly to the first point of intended landing and, assuming normal cruising fuel consumption—

"(1)  During the day, to fly thereafter for at least 30 minutes; or

"(2)  At night, to fly thereafter for at least one (1) hour".

It will be observed that this regulation provides, in part, that the plane will be provided with "enough fuel to fly to the first point of intended landing * * * at night, to fly thereafter for at least one hour." (14 CFR, Part 135).

Rumsey said that he computed the total miles of the flight and determined the amount of gas that would be required. Obviously, he did not have a one hour's reserve fuel supply when he approached Tuscaloosa. Apparently he made no attempt to check his fuel supply when he flew by Birmingham. On the way to Decatur, he had to detour around a cloud formation, which added to the mileage of the trip. If he had re-filled his reserve tank at Mobile, he could have returned to Birmingham when he found that he was out of gas, and the lights were off at the Tuscaloosa Airport. When he checked his tanks at Decatur, he found that his left tank was about a quarter full and that his right tank was between a quarter and a half full.

The Court is of the opinion that Rumsey negligently speculated as to the sufficiency of his fuel supply; that he did not comply with the regulation above quoted, and that even in the absence of the regulation, he did not use the care required of him with respect to the fuel supply of the plane, and consequently did not use due care for his own safety, not to mention the safety of his passengers. His lack of care continued up to the moment of the accident, and contributed to that accident. It is well recognized, of course, that a person confronted by great peril is not required to exercise all the presence of mind and care of a prudent and careful man. Cook, Adm'r v. Central Railroad and Banking Company of Georgia, 67 Ala. 533. However, this rule cannot be invoked by one who voluntarily puts himself in such a position. Birmingham Railway, Light and Power Company v. Fox, 174 Ala. 657, 56 So. 1013; Pittman v. Calhoun, 231 Ala. 460, 165 So. 391.

The fuel supply of a plane is vital to its operation. Even a student pilot will be charged with knowledge that such is the fact. A pilot simply cannot take a chance on his fuel supply, and he should not hazard his life and the lives of his passengers on such a chance. The regulation referred to is obviously a sound regulation. There are a number of conditions under which a reserve fuel supply may mean the difference between life and death. For example, there may be a sudden power failure at the airport, or there may be a fire, or weather conditions that would necessitate a pilot seeking another airport for a landing.

It is not remiss to observe that neither the plaintiff nor any of the other passengers were made aware or had any knowledge of the condition of the fuel supply of the plane involved. It is true that the plane was not completely out of fuel when the accident occurred, but all tanks were either empty or registered empty.

There is a dispute in the evidence as to whether Rumsey exercised the right operating procedure in his attempt to

land the plane. In view of the dispute in the evidence, the Court is unable to state that the defendant has sustained the burden of proof in that respect. However, the Court is firmly of the opinion that the negligence of Rumsey, with respect to the fuel supply, proximately contributed to the unfortunate accident and resulting injuries.

The Court finds that the active negligence of the defendant, along with that of the pilot, was such as to deprive the defendant of any right of contribution or indemnity. Wiener v. United Air Lines (S.D. California) 216 F.Supp. 701; United Air Lines v. Wiener, (9th Cir.) 335 F.2d 379.

A judgment will be entered in favor of the plaintiff as herein indicated, and against the defendant; and a judgment will also be entered denying relief to the defendant on its third-party complaint, and to the third-party defendant on his cross-claim.