Vera Zabala **CLEMENTE** et
al., Plaintiffs,

v.

The **UNITED STATES of America**,
Defendant.

Civ. Nos. 778–73, 779–73, 999–73,
1000–73 and 1096–73.

United States District Court,
D. Puerto Rico.

Nov. 24, 1976.

Speiser, Krause & Madole, Washington, D. C., for plaintiffs.

Michael J. Pangia, Aviation Unit, U. S. Dept. of Justice, Washington, D. C., Julio Morales Sanchez, U. S. Atty., San Juan, P. R., for defendant.

## OPINION AND ORDER

TORRUELLA, District Judge.

The present matter involves consolidated actions for wrongful death filed pursuant to the Federal Tort Claims Act (28 U.S.C. §§ 1346(b) and 2671 et seq.), against Defendant United States of America for the alleged negligence of employees of the Federal Aviation Administration (F.A.A.). We assume jurisdiction pursuant to said statute.

Plaintiffs are the duly qualified personal representatives and/or next of kin of decedents Roberto Clemente, Angel Lozano and Francisco Matías, all passengers who lost their lives as result of the crash of a Douglas DC–7 CF type aircraft on the evening of December 31, 1972 in Carolina, Puerto Rico. Aboard this aircraft, in addition to Plaintiffs' decedents, were Arthur S. Rivera, the owner of the airplane who was performing duties as copilot, and Jerry C. Hill, the pilot-in-command, both of whom were also killed.

The cause of this accident, and the causal link, if any, to actions or inactions of Defendant United States of America, is one of two major issues developed in this case. The second question is presented by way of Defendant's defense[1] to the effect that the conduct claimed by Plaintiffs as establishing negligence falls within the "discretionary function" exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).[2]

The aircraft in question was purchased by Mr. Rivera in. Miami, Florida on July 12, 1972. It was powered by four Curtiss Wright 988, TC 18 EA 1, Model R–3350 engines, each with Hamilton Standard 34 E 60 propellers. The maximum gross take-off weight allowable for a DC–7 CF is 144,750 pounds, provided certain approved modifications are effectuated, and if a device known as an "auto-feather" is used in the particular flight.

In September, 1972 the aircraft in question was ferried from Miami to San Juan. It arrived with its No. 3 propeller "feathered."[3]

On December 2, 1972, while Mr. Rivera was taxiing his airplane at the San Juan International Airport, there was a loss of hydraulic power causing a malfunctioning of the brake and steering systems of the craft. As a result the airplane went off the apron into a water-filled concrete ditch. Prior to hitting the ditch power was shut off the engines by Mr. Rivera, but never-

1. *United States v. Muñiz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963); *Stewart v. United States*, 199 F.2d 517 (C.A. 7, 1952).

2. "The provisions of this chapter and section 1346(b) of this Title shall not apply to—
   (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or perform-ance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

3. "Feathering" a propeller involves the changing of its angle of pitch. The propeller is feathered by manipulating controls in the cockpit, which in turn act upon mechanisms in the engine and in the propeller hub.

theless the blades in No. 2 and 3 engines hit "a hard object" before coming to a stop. The following damage was caused to the aircraft: blown starboard outboard main and nose tires, damaged No. 2 and 3 propeller blades, starboard landing gear and hydraulic lines and bracket broken, No. 3 engine cooler scoop damaged.

This incident came to the attention of F.A.A. airworthiness inspector Juan Villafañe, who was at the airport investigating official matters. He questioned Mr. Rivera concerning his intentions regarding the damage to his aircraft. Mr. Rivera indicated that he would carry out the necessary repairs. Mr. Villafañe took no further action.

Another F.A.A. airworthiness inspector, Jesús Negrón Ocasio who by chance was unofficially present at the airport on the day of this incident, was assigned the investigation of this matter. Mr. Negrón Ocasio was assisted in the investigation by Vernon Haynes, an F.A.A. general aviation maintenance inspector.[4]

In the days that followed, repairs were performed by one of the decedents, Francisco Matías, together with Rafael Delgado Cintrón, both of whom were airframe and powerplant mechanics duly authorized by the F.A.A. They checked the engine mounts as well as the sump plugs and oil filters and found them to be in good condition. No indication of shaft misalignment was found. The damaged propellers were replaced by new ones and the engines then run for three hours. Both No. 2 and 3 engines operated within permissible limits, and no indication was found of engine failure or malfunction. Thereafter Messrs. Matías and Delgado Cintrón returned the aircraft to service by the signing of the maintenance logs.[5]

On December 23, 1972 a major disaster occurred in the Republic of Nicaragua in the form of a devastating earthquake. Shortly after news of this catastrophe was received in Puerto Rico, Roberto Clemente, who was a well known major league baseball player from Puerto Rico, proceeded to organize a relief committee for its victims.[6] Mainly through Mr. Clemente's personal efforts this committee was able almost immediately to gather various emergency supplies, and within a few days of the earthquake, to airlift three airplane loads to Managua, Nicaragua.

The momentum of the relief effort was such that when the last of these flights was ready to leave on December 30th, there was more cargo available than could be loaded. At this point, Mr. Clemente, who had gone to the airport to see this flight off, was approached by Mr. Rivera.

Mr. Rivera introduced himself as the president of American Air Express Co.[7] and as having a cargo plane available which was capable of transporting the remaining relief

4. This investigation had not been completed when the present accident occurred on December 31, 1972. However, Mr. Negrón Ocasio had already concluded that a violation was indicated against Mr. Rivera for careless and wreckless operation of an aircraft. This opinion was verbally communicated by Mr. Negrón Ocasio to Leonard Davis, Chief of the F.A.A. Flight Standards District Office in San Juan, and to his immediate supervisor, Leonard Davis, the principal F.A.A. air carrier operations inspector.

Prior to this, in 1971, the F.A.A. had issued an emergency order revoking Mr. Rivera's pilot certificate for 66 violations of 14 C.F.R. 121.-3(f), i.e., using a large aircraft for the transportation of persons or property for compensation or hire without a certificate under 14 CFR Part 121. On Appeal the National Transportation Safety Board suspended Mr. Rivera's pilot certificate for 180 days. Messrs. Davis, Villafañe, Negrón Ocasio, Haynes and Coupland, participated in or knew of these enforcement proceedings against Mr. Rivera.

5. This is the method specified by F.A.A. regulations. 14 C.F.R. 43.7(b), 43.9. No prior F.A.A. approval is required.

6. Mr. Clemente had been in Nicaragua shortly before the earthquake while coaching a baseball team from Puerto Rico.

7. Mr. Rivera had been advertising his airplane for lease in the local newspaper under this company name. This was known at the time by F.A.A. personnel in San Juan, including Messrs. Negrón Ocasio, Villafañe, Davis and Haynes. The advertisement made no mention of providing crew and/or fuel.

material to Nicaragua. Mr. Clemente inspected the cargo plane and agreed on $4,000 as the charter fee to be paid upon the return of the airplane to Puerto Rico. Mr. Rivera was to supply crew and fuel for the enterprise.[8]

Federal Air Regulations in effect at that time required that when used in a commercial operation, a DC–7 aircraft be crewed by a duly qualified pilot-in-command, copilot and flight engineer.[9]

Mr. Rivera proceeded to hire Jerry C. Hill as the pilot-in-command of the flight. Mr. Hill held an airline transport pilot's certificate issued by the F.A.A. with type ratings in DC–4, DC–6, DC–7 and C–46 aircraft and had approximately 12,440 hours of flying time, of which approximately 3,000 hours were in DC–7 type aircraft, with 2,000 hours as pilot-in-command. He had last flown a DC–7 as pilot-in-command on November 10, 1972.

Mr. Rivera decided to assume the duties of copilot for the flight. He held a commercial pilot's certificate with an instrument and single and multi-engine land airplane rating issued by the F.A.A., and a type rating in Douglas DC–3 aircraft. Mr. Rivera had approximately 1900 hours of flying time of which approximately 6 hours had been entered in DC–7 type airplanes. He was not certified by the F.A.A. to perform duties as a copilot in this type of aircraft.

Mr. Rivera attempted to seek the services of a flight engineer to accompany the flight, but was unable to do so.[10]

During the 30th and 31st of December, 1972 various activities preparatory to the mercy mission centered around the DC–7 at the airport. While the aircraft was loaded with the cargo, Messrs. Matías and Delgado Cintrón at various times performed last minute maintenance check-ups, including the testing of the engines and corresponding instruments.

The loading was completed on December 31st. Based upon post-accident investigation of a fuel receipt and customs declaration,[11] the gross take-off weight of the subject aircraft was approximately 148,943 pounds, or approximately 4,193 pounds in excess of its maximum allowable gross takeoff weight.

During the morning of December 31st, the pilot of the aircraft, Mr. Hill, filed a flight plan with the F.A.A. in San Juan.

At approximately 9:11 P.M. of that day, the aircraft with all passengers and crew aboard taxied to Runway 7 on its way to meet its fate. It had not been flown since its arrival from Miami in September.

After engine run-up by the crew, the flight was cleared for takeoff at 9:20:30 P.M. The weather was good, with visibility at 10 miles and scattered cloud cover at 2200 feet.

On takeoff, the aircraft took an exceptionally long takeoff roll and gained very little altitude. A left turn was commenced towards the North, after which, at 9:23:15 P.M., the San Juan Tower received the following transmission: "N500AE coming back around." Thereafter, the aircraft crashed into the Atlantic Ocean at a point approximately 1.5 miles off shore, and 2.5 miles on the 040 degree radial from the western end of Runway 25.[12]

---

8. The type of lease in which the operational control is in the lessor is referred to in the industry as a "wet lease." Such a lessor is operating for hire and must therefore meet the certification and other requirements of 14 C.F.R. Part 121. See footnote 4 herein. Mr. Rivera did not meet these requirements prior to the flight in question and was therefore operating illegally. 14 C.F.R. 121.3, 121.6(a). The F.A.A. personnel in San Juan was unaware of this arrangement.

9. 14 C.F.R. 121.385(b), (c)(3); 121.387.

10. Mr. Matías, who as previously stated was board the aircraft when it crashed, was not a rated flight engineer, not is there any indication that he was acting as such in this flight.

11. The actual weight and balance computation made by the crew was not found.

12. The closest we have to an eye witness of the crash is Mr. Delgado Cintrón, who was present at take off. He testified that on take off the engines sounded even and normal. At the end of the take-off roll he heard three backfires and a different engine sound, caused by a change in

The wreckage site was not discovered until January 4, 1973 due to extremely rough surface conditions and poor underwater visibility.

On or after January 7th, divers from a United States Navy ship reported that the aircraft wreckage was scattered throughout the bottom the the ocean at a depth of 100 to 130 feet, in an area of approximately 4 acres. The aircraft was broken into several sections, most of them badly crushed or demolished. Both wings were separated from the fuselage. The cockpit area forward of the main junction box was destroyed and the instrument panel and mechanical controls missing. The nose gear assembly was retracted. All four engines were accounted for, but none of them were found attached to the wing structure. Two of the engines were together at a distance of approximately 200 feet from the right wing, which itself was upside down on the left side of a fuselage section.

Three of the engines were in fact recovered from the ocean floor on January 11, 1973. Among the engines recovered were Nos. 2 and 3.[13] The propeller of the No. 2 engine was "feathered" thus indicating that there had been engine failure at some point before the crash. The magnetic sump plug of No. 3 engine had pieces of broken cylinder rings, however, the rings were found intact in the cylinders of this engine.

Plaintiffs' theory of recovery is that pursuant to the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., and the regulations and orders promulgated thereunder, the F.A.A. owed a duty to Plaintiffs and Plaintiffs' decedents to promote flight safety, which duty was breached by the failure of the F.A.A. to take various actions against

Mr. Rivera, which actions would have stopped, or rendered safe, the fatal flight. Stated in more detail, Plaintiffs' contentions are based on the following proposed causal sequence: the taxi incident of December 2, 1972 caused a "sudden stoppage"[14] of No. 2 and 3 engines; as a result of its investigation of this incident, the F.A.A. should then have issued a "Condition Notice of Unairworthy Aircraft,[15] and should have requested the Regional Counsel of the Southern Region of the F.A.A. to order the revocation of the airworthiness certificate of the airplane, all of which allegedly would have grounded the aircraft; thereafter the F.A.A. should have instituted follow-up procedures of inspection and surveillance to prevent the use of the air craft until such time as the effects of the sudden stoppage were corrected; as part of these follow-up procedures, when Mr. Rivera leased the aircraft to Mr. Clemente, the F.A.A. should have required that Mr. Rivera comply with the Federal Aviation Regulations (14 C.F.R. Part 121) before holding himself out for hire under a "wet lease"; additionally, the F.A.A. San Juan Office, should have enforced SO ORDER 8430.20C against this aircraft, in which case they would have discovered from the maintenance logs that the aircraft was unairworthy, that it had an improper registration number, that it did not have proper weight and balance, and that it did not have a qualified crew, and thereafter they would have coordinated within the F.A.A. and with other governmental agencies to deny the aircraft flight clearance, and have notified Plaintiffs' decedents of the aforementioned deficiencies; and that all of these inactions contributed to, and resulted in the December 31st tragedy.

revolutions. After the aircraft was out of sight he heard an explosion.

13. Although the engine serial numbers had been removed as souvenirs by the recovery crew, it was possible to establish that these were the engines salvaged because they have hydraulic pumps, while Nos. 1 and 4 do not.

14. "Sudden stoppage" is a term of art which applies to a situation wherein an engine is

abruptly and violently ceased while under substantial power by reason of the propeller striking a solid object, and which stoppage causes internal damage to the engine.

15. This is a disciplinary type notice that can be issued administratively pursuant to F.A.A. Compliance and enforcement Policy Order 1000.9A, to obtain compliance with safety violations.

In substance, Defendant responds that there was no legal duty toward Plaintiffs' decedents to discover or anticipate acts which might result in a violation of Federal Regulations by private persons charged with compliance therewith, or to take enforcement action against said persons once such acts were known to Defendant. Furthermore, Defendant claims a lack of causal connection between any possible duty imposed upon it by law, or any alleged failure by Defendant to act in consonance with this duty, to the December 31st crash in which Plaintiffs' decedents lost their lives.

We thus plunge into the legal quagmires of causation and of the discretionary function exception of the Federal Tort Claims Act.

■ It is axiomatic that an essential element of Plaintiffs' cause of action is that there be some reasonable connection between the act or omission of the Defendant and the damage which Plaintiffs have suffered.[16] Legal responsibility must be limited to those causes which are so closely associated with the result, and are of such significance thereto, as to justify the imposition of liability. The defendant's conduct is a cause of the event if it was a material element and a substantial factor in bringing about the result. A mere possibility of such causation is not enough. Plaintiff has the burden of proof of establishing causation by a preponderance of the evidence. *Rivera v. Dunscombe*, 73 P.R.R. 764 (1952). If the matter remains one of pure speculation or conjecture, or if the probabilities are at best evenly balanced, then Plaintiff's burden has not been met. In this jurisdiction a defendant is responsible if his negligence is *a* proximate cause of the injury, even if it is not the *only* proximate cause of the damage. *Ginés Meléndez v. Autoridad de Acueductos,* 86 P.R.R. 490 (1962); *Viuda de Andino v. Autoridad de Fuentes Fluviales*, 93 P.R.R. 168 (1966).

■ Once it is established that a defendant's conduct has in fact been one of the causes of plaintiff's injury, there remains the question of whether the defendant should be held legally responsible for what he has caused. *Pabón Escabí v. Axtmayer*, 90 PRR 20 (1964). This, unlike the fact of causation, is essentially an issue of law. This is a question of whether the defendant is under any duty to the plaintiff, and if there is such duty, whether it includes protection against such consequences as have been suffered by plaintiff.

■ Our point of departure is the so-called "sudden stoppage" incident of December 2, 1972. In this respect we cannot conclude that Plaintiffs have met their burden of establishing this event as a material element of the accident here in question. Starting with the end result, that is, Nos. 2 and 3 engines after they were recovered, there is no credible evidence to establish that these engines at that time manifested any sign of having suffered a prior "sudden stoppage", in the sense of having suffered internal damage. Most indicative of this is the fact that the cylinder rings in these engines were intact. Additionally, we should note that there is no credible fact (as distinguished from conclusion) that would point to an engine failure caused by a prior "sudden stoppage." Although when recovered No. 2 engine was found feathered, which as previously stated is indicative of engine failure, upon inspection no internal damage compatible with prior "sudden stoppage" was discovered. To this we must add that after December 2, the aircraft was inspected and repaired by certified mechanics under circumstances which would seem to have been sufficient to permit discovery of serious internal damage. Thereafter these persons (one of whom was aboard the ill-fated flight) returned the aircraft to service, it being their opinion that the aircraft was airworthy. This is the procedure contemplated in the Regulation of the F.A.A. and no prior approval from this

---

**16.** On the subject of causation generally, see Prosser, *Law of Torts*, Chapter 7, "Proximate Causes", Fourth Edition, 1971. Of course, under the Federal Tort Claims Act (28 U.S.C. § 1346(b)) we are required to look to the locus of the tort for the substantive law to be applied. *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

agency is required by law.[17] We therefore fail to see how, even if "sudden stoppage" had occurred on December 2, any possible negligence by these mechanics in improperly returning the aircraft to service, can be imputed upon the F.A.A.

■ From the evidence adduced at the trial we are of the opinion that the failure of No. 2 engine was caused by an "overboosting" of the engine upon takeoff. This in turn was caused by the lack of a proper flight crew.

The inadequacy of the flight crew, in particular the lack of a trained copilot and the total absence of a flight engineer (both crew members whose functions are of prime importance in preventing "overboosting"), together with a gross take-off weight which exceeded the maximum allowable limits by more than two tons, created a situation wherein ". . . for all practical purposes the Captain was flying solo in emergency conditions."[18]

We must inquire as to whether the Defendant owed a duty toward Plaintiffs' decedents relevant to the creation of this situation.

■ It appears to us to be undisputable that by the enactment of the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq., Congress intended to impose a duty on the F.A.A. to promote maximum safety in the use of the Nation's airspace. 49 U.S.C. §§ 1302, 1303, 1421; *Arney v. U.S.*, 479 F.2d 653 (C.A. 9, 1973); *Air Line Pilots Ass'n Int'l v. Quesada*, 276 F.2d 892 (C.A. 2, 1960); *Rosenhan v. U.S.*, 131 F. 932 (C.A. 10, 1942), cert. denied 318 U.S. 790, 63 S.Ct. 993, 87 L.Ed. 1156 (1942); *Doe v. Dept. of Transp. F.A.A.*, 412 F.2d 674 (C.A. 8, 1969). We are concerned, however, with the nature and extent of this duty as applied to Plaintiff's decedents.

In the exercise of duties established by the above mentioned Statute, the Director of the Southern Region of the F.A.A. on September 25, 1972 issued Order SO8430.-20C entitled "Continuous Surveillance of Large and Turbined Powered Aircraft." At least by October 31, 1972 this Order was being put into effect by the Flight Standards District Office in San Juan.[19]

This Order, in its relevant parts, reads as follows:

"1.  PURPOSE. This order outlines procedures for a continuous surveillance program of large and turbine powered airplanes. . . .

2.  DISTRIBUTION. This order requires action by Air Traffic field facilities and General Aviation, Air Carrier, and Flight Standards District Offices. . . .

3.  ACTION. Flight Standards ACDOs, GADOs, and FSDO will coordinate with Air Traffic facilities to establish the method for notification of arriving and departing large aircraft and turbine powered aircraft that cannot be readily identified as bona fide air carriers, commercial carriers, travel clubs, air taxis, or executive operators. Representative of these are: . . . DC-7 . . . To accomplish this program effectively, consideration should be given to night and weekend surveillance with the use of irregular or modified work week, as necessary.

.        .        .        .        .

5.  BACKGROUND. Several accidents/incidents involving noncertificated operators disclosed that these operators were transporting specialized groups for compensation or hire without an appropriate operating certificate, and little regard to airworthiness safety standards on their

17.  See footnote 5, supra.

18.  Although we have taken this statement from the F.A.A. accident report dated February 22, 1973 (Plaintiff's exhibit 2.1), said report is not the basis for any finding in this decision.

19.  The San Juan Office is within this Southern Region of the F.A.A. This order was in substance a repetition of Orders SO8430.20A and SO8430.20B which had previously been issued on April 5, 1971 and August 2, 1971, respectively.

aircraft. During the special 60 days surveillance program completed by Flight Standards offices, it was discovered that a considerable number of such noncertificated operators of large aircraft and turbine powered aircraft are engaged in passenger and cargo commercial operations contrary to applicable provisions of either part 121 or 135 of the Federal Aviation Regulations.

6. SURVEILLANCE PROCEDURES. ACDOs GADOs, and FSDO will provide continuous surveillance of large and turbine powered aircraft to determine noncompliance of Federal Aviation Regulations. At least the following actions will be taken:

a. Contact noncertificated operators of large and turbine powered aircraft within your area of responsibility, and advise them of certification requirements, as appropriate.

b. Conduct airport surveys to determine the number, type and status of large and turbine powered aircraft on airports. . . .

c. Continue efforts to encourage . . . specialized groups to contact the nearest Flight Standards office prior to engaging operator for air transportation.

d. In cases when information is known in advance of flights:

(1) Interview operator/owner, flight crews, and others including passengers to determine whether the proposed flight is a commercial or private operation.

(2) If noncompliance with applicable regulations is indicated, advise the operator and flight crew accordingly.       `

7. ON SITE INSPECTION

a. Conduct ramp inspection with at least the following emphasis to determine that the crew and operator

comply with regulatory requirements for safety of flight.

.    .    .    .    .

(6) Airworthiness of the aircraft.

.    .    .    .    .

(8) Weight and Balance

.    .    .    .    .

(10) Pilot qualification  .    .    .

.    .    .    .    .

d.  .    .    .  Clear indication of alleged illegal flight should be made known to flight crew and persons chartering the service.

8. ENFORCEMENT INVESTIGATION PROCESSING

A. When noncompliance of any kind is found, investigation and violation action shall be given priority second only to aircraft accident investigation  .    .    ."

■ It would seem that SO 8430.20C is applicable to the flight here in question, and that Plaintiffs' decedents are within the class of persons sought to be protected thereby. Furthermore, we are of the opinion that adherence by the San Juan F.A.A. personnel to the procedures dictated therein would have in all probability resulted in the saving of plaintiffs' decedents' lives not, as is alleged by Plaintiffs, because the flight could have been physically or legally prevented from departing,[20] but because most assuredly upon the performance of a ramp inspection of the aircraft the lack of a proper crew and the gross over weight would have become apparent to the inspecting authority. Upon such a "clear indication of illegal [and unsafe] flight" being made known to Plaintiffs' decedents, it is reasonable to presume that they would not have participated as passengers in this dubious enterprise, (*Gercey v. U. S.*, 540 F.2d 536, at page 538, No. 76–1137 (C.A. 1, 1976) and in any event, if after such a warning they would have chosen to act against normal instincts of self preservation, having thus

---

**20.** From the testimony and documentary evidence we are unconvinced that the enforcement machinery available could have effectively been brought to bear. Furthermore failure to take such enforcement action is not actionable. *Smith v. United States*, 375 F.2d 243 (C.A. 5, 1967), cert. denied 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967).

assumed the risks inherent in such actions, they and their successors would be in a tenuous position to legally complain of the predictable results.

Considering the above, it would normally be incumbent upon us to proceed to conclude without further ado that the misfeasance of the San Juan F.A.A. personnel in failing to follow their own regulations, was negligence and was a contributing factor to the events here in dispute. *Ingham v. Eastern Air Lines, Inc.*, 373 F.2d 227 (C.A. 2, 1967); *Hoffman v. United States*, 398 F.Supp. 530 (E.D.Mich., 1975); *Pennsylvania Railroad Co. v. United States*, 124 F.Supp. 52 (D.N.J., 1954).

However, Defendant raises a defense which requires further analysis and presents issues of a factual and legal nature. The substance of Defendant's argument is as follows: the method and manner of enforcing SO 843.20C by the San Juan Flight Standards Office is a policy determination which the Director of that office is free to make based upon such factors as funds and available manpower; thus the failure to discover any lawbreaker by reason of the manner in which the Director has determined the order should be administered, does not give rise to any cause of action on behalf of the victims of the lawbreaker, because that policy decision and its consequences are protected by the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a).

In support of this proposition Defendant presented testimony to the effect that the issuing authority promulgated this order as being discretionary rather than mandatory on the local offices, and that pursuant to this interpretation and the exigencies of personnel, the San Juan Director decided to apply the order only to arriving aircraft rather than to arriving and departing aircraft as stated in the order.

The second part of Section 2680(a) excluded claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." See generally, Jayson, "Personal Injury, Handling Federal Tort Claims", Vol. 2, Sec. 245 et seq.

The leading case in this matter is *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). That case involved death, personal injury, and property damage claims resulting from an explosion of fertilizer known as "FGAN" aboard a vessel in the harbor at Texas City, Texas. The FGAN was produced pursuant to a government program designed to increase food supplies in occupied countries after World War II. The District Court made findings of negligence with regards to the manufacture, bagging, labeling, and shipment of a dangerous product, and in failing to give notice of its dangerous nature to the persons handling such products. It further concluded that the Coast Guard was negligent in policing the shipboard loading of the dangerous substance and in fighting the fire which later developed. The Court of Appeals reversed [21] and its action was affirmed by the Supreme Court.

The opinion of the Court first deals with the nature of this exclusionary provision. The Court states that "[o]ne only need read § 2680 in its entirety to conclude that Congress exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions." [22] Following this proposition, the Court continues: [23]

". . . It excepts acts of discretion in the performance of governmental functions or duty 'whether or not the discretion involved be abused.' Not only agencies of government are covered but all employees exercising discretion. It is clear that the just-quoted clause as to abuse connotes both negligence and wrongful acts in the exercise of the discretion because the Act itself covers only

---

**21.** *In Re Texas City Disaster Litigation*, 197 F.2d 771 (C.A. 5, 1952).

**22.** At 346 U.S. page 32, 73 S.Ct. page 966.

**23.** Id., at pages 33–34, 73 S.Ct. page 966.

'negligent or wrongful act or omission of any employee', 'within the scope of his office' 'where the United States, if a private person, would be liable.' . . . The exercise of discretion could not be abused without negligence or a wrongful act. The Committee reports . . . show this . . .

. . . The 'discretion' protected by the section is not that of the judge—a power to decide within the limits of positive rules of law subject to judicial review. It is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law."

In discussing the scope of this exception the Court said: [24]

". . . It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. *Where there is room for policy judgment and decision there is discretion.* It necessarily follows that acts of subordinates in carrying out the ᐤperations of government *in accordance with official directions* cannot be actionable. If it were not so, the protection of Sec. 2860(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion." (Emphasis supplied).

Finally, regarding the alleged negligence of the Coast Guard in failing to prevent the fire by regulating the storage or loading of the FGAN in a different fashion, the Court held that the power to regulate was discretionary and "classically within the exception." [25]

Several cases decided by the various Federal courts since *Dalehite* may further aid in understanding the exception. In *Brooks v. United States*, 152 F.Supp. 535 (S.D.N.Y., 1957), a claim based upon the Government's failure to prosecute was dismissed pursuant to this provision. Likewise, in *Westchester Fire Insurance Co. v. Farrell's Dock & Term. Co.*, 152 F.Supp. 97 (D.Mass., 1957), it was held that the failure of the Government to discover and prosecute the persons responsible for spreading oil on navigable waters, which oil caught fire and damaged claimant, was not actionable because it was the exercise of a discretionary function. See also *Smith v. United States*, 375 F.2d 243 (C.A. 5, 1967), cert. denied 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *Goodwill Industries of El Paso v. United States*, 218 F.2d 270 (C.A. 5, 1954); Cf. *Gercey v. United States*, supra (decided under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., wherein it was held that in the absence of a specific Congressional mandate, there exists no duty upon the Coast Guard to establish a follow up system to prevent the use by the public of a vessel which the Coast Guard refused to certify, and which it knew was unsafe).[26]

In juxtaposition Plaintiffs place reliance upon another line of cases, the leading one being *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).[27] In that particular case the Coast Guard because of improper maintenance, permitted the light to go out in one of the light houses it operated. As a result claimant's vessel grounded. The Court refused to be led into "the 'non-governmental'— 'governmental' quagmire that has long plagued the law of municipal

---

24. Id., at pages 35–36, 73 S.Ct. at page 968.

25. Id., at page 43, 73 S.Ct. at page 971.

26. "The *decision* whether to institute such a policy, in our view, involves a basic policy judgment as to how the public interest may best be promoted." (emphasis added), supra, at page 538.

27. This case was actually not decided on the issue of the discretionary function exception, see 350 U.S. at page 64, 76 S.Ct. 122.

corporations."[28] It held instead that "it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner."[29]

The Court went on to say:[30]

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. . . ."

Following this same reasoning, in *Sullivan v. United States*, 299 F.Supp. 621, 625–626 (N.D.Ala., 1968), aff'd 411 F.2d 794 (C.A. 5, 1969), liability was imposed upon the Government because of the failure of the F.A.A. to turn on airport runway lights, where the Airman's Information Manual and the chart furnished to airmen by the Government, indicated that the airport had lights and that they would be turned on when a pilot circled the field at night. See also *Fair v. United States*, 234 F.2d 288 (C.A. 5, 1956) and *Swanner v. United States*, 309 F.Supp. 1183 (M.D.Ala., 1970); but compare *Monarch Ins. Co. v. District of Columbia*, 353 F.Supp. 1249 (D.C.Dist.Col., 1973). Conversely, in *Doody v. United States*, 296 F.Supp. 210 (D.Me., 1969), an action against the Coast Guard for damages resulting from an explosion of a torpedo recovered in a fishing net was dismissed. There the Coast Guard issued erroneous instructions as to the handling of these explosives but claimants failed to show that these warnings were ever received or relied upon in recovering the torpedo.

We think, however, that the situation presented by *Hoffman v. United States*, supra, is more closely akin to the present case than are the "Good Samaritan" cases. In *Hoffman*, supra, the F.A.A. issued a certificate to the owner of an air taxi operation notwithstanding the fact that the owner did not hold economic authority from the Civil Aeronautics Board as required by F.A.A. regulations, a fact known by the F.A.A. at the time the certification was issued. The F.A.A. acted pursuant to a "notice" issued to its field personnel which instructed them not to deny certification for this reason, but rather to refer these violations to the CAB for enforcement. Thereafter the aircraft crashed and the passengers brought an action against the F.A.A. for negligence in the issuance of the certificate.

The F.A.A. alleged that the decision not to enforce was within the discretionary function, while Plaintiffs argued that once the F.A.A. regulation was promulgated, failure to follow it amounts to negligence in the exercise of a ministerial function.

In denying defendant's motion for summary judgment based on 28 U.S.C. § 2680(a), the Court said (supra, at page 539):

"... Application of this regulation is done after the planning, or discretionary, state—at the operational level. *A claim of negligence in the application of this regulation does not involve a discretionary function . . . Negligence in the application of this regulation would render the government liable* . . .

. . . The government has not cited any provision whereby the FAA was empowered to alter the standards contained in a regulation through the informal procedure here employed. While the court

---

**28.** Id., at page 65, 76 S.Ct. at page 124.

**29.** Id., at pages 64–65, 76 S.Ct. at page 124. See also *Somerset Seafood Co. v. United States*, 193 F.2d 631 (C.A. 4, 1951) (negligent marking of wreck); *Everitt v. United States*, 204 F.Supp. 20 (S.D.Tenn., 1962); *Petition of*

*United States*, 255 F.Supp. 737 (D.Mass., 1966); *Somlo v. United States*, 274 F.Supp. 827, 836 (N.D.Ill., 1967), aff'd 416 F.2d 640 (C.A. 7, 1969), cert. denied 397 U.S. 989, 90 S.Ct. 1122, 25 L.Ed.2d 397 (1970).

**30.** Id., at page 69, 76 S.Ct. at page 126.

recognizes the government's argument that the formulation of this notice was a policy decision—a discretionary act—the court does not believe that this alters the conclusion that § 2680(a) does not apply.

When the FAA promulgated the 'FAA Notice,' it was formulating a policy. In short, the policy was to disregard a former policy decision embodied in a duly promulgated regulation. Admittedly, the formulation of policy falls within the discretionary function exception. Thus, if one were to characterize the plaintiffs' complaint as one attacking a policy, the suit would be barred. However, one can just as easily characterize the complaint as one complaining of the refusal to apply a regulation. It is this latter characterization which the court believes to be the proper one.

The result would be different if the regulation was not as specific and thus gave the FAA discretion in its application. But the court does not read the regulation in this manner. The result would also be different if the government could point to some authority which gave the FAA the power to change the policy by a method other than the formal amendment of the regulation. But without such citation of authority, the court believes that the regulation did not give the FAA the 'discretion' to informally amend the regulation." (emphasis supplied).

Within the framework of this legal setting we return to SO 8430.20C.

We have no difficulty in concluding that this order was a clear exercise of policy judgment as to how the public interest was best to be promoted. Cf. *Gercey v. United States*, supra. Furthermore we are not persuaded by the testimony presented in support of the proposition that the issuing authority intended this order to be applied at the discretion of the District Office. In a trial congested by documentary evidence, Defendant failed to buttress this allegation in any credible manner. At this late hour such a contention smacks of litigation-oriented reasoning, particularly when we consider that the language in Paragraph 2 of the "order *requires* action by . . . Flight Standards District Offices . . ." (emphasis supplied). In our opinion it is self-evident that this order is mandatory in nature.[31] Any possible residual discretion left to the District Office as to the operational implementation of this policy can hardly grant license to the mind-boggling logic whereby arriving aircraft are given preference over those about to depart, such action being in clear contravention to the basic policy established by higher authority.[32]

Therefore not being concerned with the exercise of a discretionary function but rather the performance of duties within the framework of a regulation, the "exercise of due care" standard contained in the first part of § 2680(a) is applicable.[33] *Hatahley v. United States*, 351 U.S. 173, 181, 76 S.Ct. 745, 100 L.Ed. 1065 (1956); *Sickman v. United States*, 184 F.2d 616, 620 (C.A. 7, 1950); *Hoffman v. United States*, supra. It

---

**31.** The use of the words "shall", "should" and "will" later in this document must be seen in the light of the all-encompassing mandate of Paragraph 2, and viewed in that light it indicates to us that they were used interchangeably in a mandatory sense. Webster's New International Dictionary (unabridged), pp. 2085–2086, 2104, 2616–2617.

**32.** It has been suggested that among the relevant factors to be considered in the application of the discretionary function exception are: (1) whether the person whose judgment is attacked occupies a high or low level governmental position (*Hendry v. United States*, 418 F.2d 774, 782 (C.A. 2, 1969), (2) the nature and quality of the judgment exercised, (*Downs v.*

*United States*, 522 F.2d 990, 997 (C.A. 6, 1975), and (3) whether the conduct involves discretionary acts at a "planning stage" in contract to discretionary acts at an "operational stage." (*United States v. State of Washington*, 351 F.2d 913 (C.A. 9, 1965); but compare *Coastwise Packet Company v. United States*, 277 F.Supp. 920, 924 (D.Mass., 1968), aff'd 398 F.2d 77 (C.A. 1, 1968), cert. denied 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274 (1968). In our opinion none of these standards are of any aid to Defendant.

**33.** "Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation . . ."

follows that in violating its own orders, the F.A.A. demonstrated a failure to exercise due care. *Griffin v. United States*, 500 F.2d 1059 (C.A. 3, 1974); *United Air Lines v. Wiener*, 335 F.2d 379, 393–394, (C.A. 9, 1964), cert. dismissed 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964), and that, as previously expounded herein, by said misfeasance contributed to the death of Plaintiffs' decedents.

In view of the above we find for Plaintiffs on the issue of negligence.

IT IS SO ORDERED.